[Cite as *In re M.J.H.*, 2020-Ohio-4399.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

|  |  |  |
|---|---|---|
| IN RE: M.J.H. | : | |
| | : | |
| | : | Appellate Case No. 28733 |
| | : | |
| | : | Trial Court Case Nos. G-2017-1798 |
| | : | |
| | : | |
| | : | (Appeal from Common Pleas |
| | : | Court – Juvenile Division) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 11th day of September, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by JAMIE J. RIZZO, Atty. Reg. No. 0099218, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
 Attorney for Appellee, MCCS

CARL A. LUX, Atty. Reg. No. 0078524, P.O. Box 128, Alpha, Ohio 45301
 Attorney for Appellant, Mother

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Mother appeals from the juvenile court's January 28, 2020 judgment granting custody of her daughter M.J.H. to paternal relatives. We hereby affirm the judgment of the juvenile court.

{¶ 2} As a preliminary matter, we note that Mother has two daughters, M.J.H. and M.H. The children's cases had separate case numbers in the juvenile court (Case Nos. 2017-1798 and 2017-1799), but many of the hearings and filings related to both cases. In a judgment entry that listed both case numbers, the juvenile court granted custody of the children to an aunt and uncle. However, Mother's notice of appeal listed only Case No. 2017-1798, which related to M.J.H. In her brief, Mother incorrectly asserts that this appeal involves both children.[1] Although the trial court addressed the cases together and the issues on appeal in the two cases would likely be similar, we lack jurisdiction as to Case No. 2017-1799 and therefore confine our review to Case No. 2017-1798.

{¶ 3} We also note that the record is somewhat confusing regarding the children's names, dates of birth, and case numbers, in part because both children have the initials "M.H." The neglect and dependency complaint filed in this case (M.J.H.'s case, Case No. 2017-1798) was captioned "In re M.H." and referenced M.J.H.'s 2012 date of birth. However, the body of the complaint discusses M.J.H.'s sister M.H.'s birth in 2016, at which time both Mother and M.H. tested positive for opiates. In other words, the complaint in M.J.H.'s case listed the circumstances around her sister's birth, as well as other factors, as the bases for MCCS's assertion that M.J.H. was neglected and dependent.

---

[1] Montgomery County Children Services pointed out in its brief that Mother had appealed only one of the two cases. Mother did not file a reply brief and has not otherwise addressed this issue.

{¶ 4} On March 24, 2017, Montgomery County Children Services ("MCCS") filed a neglect and dependency complaint in M.J.H's case alleging that Mother and her new baby, M.H., had tested positive for illegal drugs (opiates) at the time of M.H.'s November 2016 birth at Miami Valley Hospital and that Mother had not sought any prenatal care while pregnant with M.H. The complaint stated that Mother had also previously tested positive for fentanyl and that Father tested positive for various illicit drugs four days after M.H.'s birth. According to the complaint, from November 2016 to the time of the complaint, the paternal grandmother had been residing in the home "to ensure the safety of the children," but her presence had not "prevented illegal drug use" by Mother and Father while the children were present. A February 2017 drug screen of both parents at MCCS was positive for fentanyl. On March 10, 2017, a placement was arranged and both children were put on a safety plan with paternal relatives ("Aunt and Uncle").[2]

{¶ 5} On April 11, 2017, after a shelter care hearing, the magistrate issued an order granting interim custody of M.J.H. to Aunt and Uncle. On May 11, 2017, an adjudication and dependency hearing occurred; as a result, M.J.H. was adjudicated a dependent child. The court granted temporary custody of M.J.H. to Aunt and Uncle and granted Mother parenting time.[3]

{¶ 6} On January 2, 2018, MCCS filed a motion for legal custody of the children to Aunt and Uncle. The attached affidavit of Ed Pitman stated that Mother had made little progress on her case plan, had not been cooperative with MCCS, and had last met with

---

[2] Father was incarcerated during much of the time that this case was pending, did not engage with MCCS about his case plan, and is not a party to this appeal.

[3] In the same order, M.H. was adjudicated dependent and abused, and she was also placed with Aunt and Uncle.

MCCS in August 2017, at which time there were concerns that Mother was intoxicated during that meeting. Pitman's affidavit further stated that Mother "reported that she was receiving Vivitrol treatment through Samaritan Behavioral Health but MCCS ha[d] been unable to verify Mother's compliance with this program due to Mother's lack of contact with MCCS." According to Pitman, several attempts had been made to meet with Mother, but she did not respond to the requests; it was unknown whether Mother had income or housing, and she reportedly had stayed at a hotel "under a fake name." Pitman averred that Mother visited her children at the home of their maternal grandmother and had discussed the status of the children's cases with them.

{¶ 7} On March 5, 2018, Mother filed a motion for a first extension of temporary custody. The motion stated that she had recently obtained housing, had "made steps to enter treatment at Women's Recovery," where she would participate in in-patient treatment for her drug addiction, and was "consistent with visitation" and wanted to continue to work toward reunification.

{¶ 8} A dispositional hearing was held on March 19, 2018. Tiffany Collins, a caseworker at MCCS, had been involved in Mother's case since January 2018. Collins testified that M.J.H. and M.H. had resided with Aunt and Uncle since March 2017 and that the children were "doing great" in their placement; their needs were being met, and MCCS had "no concerns." Collins testified that Aunt and Uncle had an eight-year-old daughter who also lived in their home. Collins testified that she had been to the home and that a home study was approved. She stated that the home had adequate space for the children and that the children were "most certainly" bonded to Aunt and Uncle and to their daughter.

{¶ 9} Collins testified that Mother's case plan was developed in March 2017. Mother signed her case plan and agreed to complete the objectives therein, which were: to obtain an alcohol and drug assessment and follow recommendations; to obtain and maintain appropriate housing for the children; to obtain or maintain employment or income via employment or benefits; and visitation with both children. Collins testified that Mother was required to sign all releases of information, and that she had done so except the one to "TCN and Women's Recovery," which Collins brought for her to sign on the day of the hearing.

{¶ 10} Collins testified that Mother had an "ongoing substance abuse issue" and that had been referred to Women's Recovery, to Crisis Care, and for in-home treatment. Collins stated that Mother's previous case worker, Ed Pitman, also made referrals for Mother, and that she had her initial assessment at Crisis Care in August 2017. Collins testified that it was recommended that Mother begin the medically-assisted treatment program at that time, but Mother did not do so, telling Collins that she did not want to follow through with that "because she felt that she was substituting one drug for another." Collins stated that it was also recommended that Mother follow through with certain individuals, but she did not do so. Collins testified that Mother did not receive any other services from Crisis Care in August 2017.

{¶ 11} Collins stated that Mother had "[j]ust recently" been assessed at TCN and had been "recommended for the medically-assisted treatment program," which was supposed to begin the day after the hearing, when two appointments were scheduled. Collins testified that it was recommended that Mother participate in the medically-assisted treatment program until a bed became available at Women's Recovery, which would

probably be in two to four weeks. She stated that the Women's Recovery program was 90 to 120 days, depending on an individual's progress during treatment.

{¶ 12} Collins testified that MCCS still had concerns about Mother's alcohol and drug use, namely that she was "continuing to use on a regular basis." She stated that in December 2017, Aunt and Uncle reported that they believed Mother was under the influence at a visitation; they terminated the visit. Collins testified that the drug and alcohol portion of the case plan was "in progress but not complete."

{¶ 13} Regarding Mother's housing objective, Collins testified that Mother had been living with a boyfriend in a one-bedroom apartment for a month and a half, and that Mother was not listed on the lease. Collins stated that the boyfriend obtained his housing through the Veterans Administration and that there was not adequate space there for Mother's children. When asked if it was appropriate housing, Collins responded that there were no supplies or furniture for the children. Collins testified that MCCS investigated the boyfriend, and he had "some previous drug charges back several years ago, but nothing current." She stated that, early in the case, Pitman had referred Mother to Dayton Metropolitan Housing Authority housing, but Mother no longer qualified for that. Collins testified that, prior to her living with her boyfriend, Collins did not believe Mother had had housing, and that Mother "was residing with her mother when I found her."

{¶ 14} Collins stated that, from August 2017 through January 2018, Mother had had no contact with MCCS; MCCS caseworkers were expected to make face-to-face contacts once a month with parents, but Ed Pitman had attempted unsuccessfully to meet with Mother during those months.

{¶ 15} Collins testified that Mother did not have income or receive benefits, and

she was referred to the Job Center in January 2018. The income portion of her case plan was not complete.

{¶ 16} Collins testified that Mother visited consistently with the children once a week; Mother's visits were supervised – and should continue to be so -- because Mother was not engaging in alcohol or drug treatment. Collins stated that MCCS would eventually like a visitation schedule implemented based upon an agreement between Aunt and Uncle and Mother.

{¶ 17} Collins testified that legal custody to Aunt and Uncle was in the children's best interest; the children had been living with Aunt and Uncle for the last year, and Mother had not made significant progress on her case plan. Collins testified that MCCS provided case management, information and referrals, and a home study.

{¶ 18} On cross-examination by counsel for Mother, Collins testified that she found Mother on January 30, 2018, after she received information from Aunt and Uncle that Mother was staying with her mother; Collins made an unannounced visit and found Mother there. Mother did not have any other place to live at that point. Collins testified that she next saw Mother at her new apartment in February. Mother reported to Collins that her landlord had told her (Mother) that she would be able to move into a two-bedroom apartment when one came available, but Mother did not know when that would be. Collins stated that the Women's Recovery program was a "very intensive * * * inpatient treatment facility" with group and individual therapy.

{¶ 19} On cross-examination by the guardian ad litem ("GAL"), Collins testified that since she took over the case in January 2018, she had not had any issues making contact with Mother.

{¶ 20} On redirect examination, Collins testified that MCCS had concerns about Mother's follow-through with the inpatient program, noting that Mother had "had a year to engage in services and ha[d] not done so." Collins noted that Mother did not follow through with the Crisis Care recommendation in August 2017 and that she failed to attend an appointment on March 5, 2017. When asked if MCCS had concerns about Mother not being forthcoming with regard to going to assessments, Collins responded, "I would say the first one at Crisis Care I had a concern about because she did tell me that she was attending, that she was going, and she did not go. And when I received * * * the reports back from Crisis Care, that's when I found that she went in August of 2017, not in February."

{¶ 21} Mother testified that she could be added to the lease at her boyfriend's apartment at the end of the month; she did not know when a two-bedroom apartment would be available, but the landlord knew that she needed one "as soon as it's possible." When asked why she was not working, Mother stated that she had been "putting in applications," but stopped when she decided to go to inpatient treatment. She was preparing to start with TCN Behavioral the next day with "the medication induction," and then the groups would be "on Wednesdays." Mother testified that she would do intensive outpatient treatment until there was a bed at Women's Recovery.

{¶ 22} Mother stated that she did not want to do the medication-assisted treatment program because "that was only suboxone." She stated that she planned to get the Vivitrol shot, which "seem[ed] a lot more beneficial." When asked why she felt that she was ready to do an inpatient program, Mother stated that she had asked for a six-month extension of temporary custody, so that if she did inpatient rehab for 45 to 90 days, she

would still have six months "to finish the rest of [her] stuff," whereas she had heard that outpatient treatment was "a really long, ongoing process." Mother stated that she was motivated to stay clean and sober and off of opiates and was willing to sign releases for TCN and Women's Recovery.

{¶ 23} Mother testified that her visitations were going well every week. When asked about her failure to complete Crisis Care, Mother testified that Crisis Care was "not a very good program at all."

{¶ 24} On cross-examination by MCCS, Mother testified that she had last used opiates "within the last week," but it had been "quite a while" before that, and she did not use them daily like she used to. Mother testified that she used opiates daily until November 2017, and then "every few weeks" after that. Mother acknowledged that she went to an assessment at Crisis Care in August 2017 and did not follow through with the recommendations because she "didn't like the program," which was only seven days, with medications and then groups.

{¶ 25} Mother acknowledged that from August 2017 until her March 14, 2018 assessment, she was not involved with any treatment providers for drugs or alcohol. She was willing to take a drug test provided by MCCS. Mother testified that between March 2017 and February 2018, she never had independent housing; she went back and forth between her mother's and her boyfriend's homes. She stated that she worked at Hoagie's Pizza from August 2017 until the end of December 2017, but her employment was terminated because someone reported to the restaurant that she was using drugs.

{¶ 26} On cross-examination by the GAL, Mother testified that she could sign the lease at her boyfriend's apartment "as like a co-signor, or just a resident," but she planned

to sign as a co-signor so she was "also responsible for the apartment." When asked if she would be able to do that while she was in treatment, Mother responded, "I haven't asked that yet." Mother acknowledged that her boyfriend supported her, but she planned to get a job when she got out of inpatient treatment.

{¶ 27} Mother stated that her visitation with the children was for two hours each week and that she would not visit her children while under the influence. Mother testified that her mother was "completely not on [her] side" and would "quit the visit" if she thought Mother under the influence.

{¶ 28} The GAL recommended custody of the children to Aunt and Uncle.

{¶ 29} On March 19, 2018, the magistrate's decision granted legal custody of M.J.H. to Aunt and Uncle. Mother filed objections on March 26, 2018, and MCCS filed a reply to the initial objections on April 3, 2018. In March 2019, Mother supplemented her objections. She argued that the magistrate "failed to properly determine the factual issues and appropriately apply the law." She asserted that the magistrate had failed to acknowledge her progress in completing her case plan and that she had taken steps to get her drug addiction under control, "albeit very recently." Mother asserted that an "extension of temporary custody was the more proper disposition" to allow her to enter and complete inpatient treatment and reunify with her children. Finally, Mother argued that the magistrate improperly applied the best interest factors in R.C. 2151.414(D)(1). On January 6, 2020, MCCS filed a reply to Mother's supplemental objections.

{¶ 30} After thoroughly discussing the testimony at the hearing, the juvenile court overruled Mother's objections and determined that granting legal custody of the children to Aunt and Uncle was in their best interest. The court found that the children needed a

safe and stable home environment, and that Mother's substance abuse issues, housing issues, and lack of income caused uncertainty for them.

{¶ 31} Regarding an extension of temporary custody, the juvenile court concluded that there had been no change in circumstance and no significant progress on Mother's case plan, despite her having ample opportunity to do so. The court further found that Mother had not demonstrated by clear and convincing evidence that an extension would be in the children's best interest. Finally, the court concluded that it did not have reasonable cause to believe that the children could be reunified with Mother or otherwise placed within the period of extension.

{¶ 32} Mother asserts one assignment of error on appeal:

THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING LEGAL CUSTODY TO PATERNAL AUNT AND UNCLE, AND THE DECISION WAS NOT IN THE CHILD'S BEST INTEREST.

{¶ 33} Regarding her case plan, Mother asserts that she engaged with TCN on March 14, 2018 and was "looking forward to beginning the inpatient treatment program at Women's Recovery." Mother asserts that she "indicated a willingness to obtain a larger two-bedroom apartment" and that the use of the same address as her residence on the magistrate's order of February 28, 2018, and on her notice of appeal filed on February 27, 2020 proved "that she obtained and maintained stable housing for at least two years."

{¶ 34} Regarding employment, Mother contends that she worked at Hoagie's Pizza from August to December 2017, and that while she had since been applying for work, she "sacrificed that possible short-term gain for the greater long-term good of

attending inpatient treatment" for "the allegations of drug use."   She also argues that obtaining a job "was largely rendered perfunctory" because her boyfriend was supporting her.    Mother asserts that she consistently visited her children, signed all releases, and was willing to sign additional ones at the hearing.

{¶ 35} Regarding the best interest factors in R.C. 3109.04(F)(1), Mother contends that she wants custody of her children, that her relationship with her children is good, and that M.J.H. "has spent more of her life living with Mother than with the custodians." Mother asserts that, although there was some testimony as to her use of pharmaceuticals, there were no allegations that she suffers from any mental health issues and, although she tested positive for illicit substances at the time of M.H.'s birth, there was no evidence that her intoxication had ever actually interfered with her ability to effectively parent the children.   Mother points to her testimony that asserts that she "had been free of opiates for a substantial period of time prior to the hearing."   Finally, Mother asserts that the children did not need a legally secure placement at the time of the trial court's decision because there were "no concerns" about the temporary placement with Aunt and Uncle, and there was no testimony or evidence that Aunt and Uncle would not be willing to continue as temporary custodians while Mother finished her inpatient treatment program and got a job to complete her case plan objectives.

{¶ 36} MCCS responds that the best-interest factors favored granting legal custody of M.J.H. to Aunt and Uncle, because she needed stability and support that Mother had "shown no ability to provide."

{¶ 37}   A court may award legal custody of a dependent child to a parent or to any other person who asks for legal custody or is proposed as a legal custodian.   R.C.

2151.353(A)(3); *In re R.H.B., L.M.B., and L.M.B.*, 2d Dist. Clark Nos. 2015-CA-12, 2016-Ohio-729, ¶ 7.

When a juvenile court makes a custody determination under R.C. 2151.353, it must do so in accordance with the "best interest of the child" standard set forth in R.C. 3109.04(F)(1). See *In re Poling*, 64 Ohio St.3d 211, 594 N.E.2d 589, 1992-Ohio-144, paragraph two of the syllabus, and R.C. 2151.23(F)(1) (requiring a juvenile court to exercise its jurisdiction in accordance with R.C. 3109.04 as well as other sections of the Ohio Revised Code). The factors a court must consider in determining a child's best interest include such things as the parents' wishes; the child's wishes, if the court has interviewed the child; the child's interaction with parents, siblings, and others who may significantly affect the child's best interests; adjustment of the child to home, school, and community; and the mental and physical health of all involved persons. * * *

*In re D.S.*, 2d Dist. Clark No. 2013 CA 51, 2014-Ohio-2444, ¶ 9.

{¶ 38} We have further noted:

In a legal custody dispute, as opposed to a more drastic termination of parental rights, a court must find by a preponderance of the evidence that its decision is in the child's best interest. *In re A.W.*, 2d Dist. Montgomery No. 21309, 2006-Ohio-2103, ¶ 6. "Preponderance of the evidence simply means 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " *In re Starks*, 2d Dist. Darke No. 1646, 2005-Ohio-1912, ¶ 15, quoting Black's Law Dictionary 1182 (6th

Ed. 1998). The standard that a reviewing court uses to evaluate a manifest-weight challenge is familiar: " 'The court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20 (saying that this standard applies in civil cases). "A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." *Seasons Coal Co. v. City of Cleveland*, 10 Ohio St.3d 77, 81, 461 N.E.2d 1273 (1984).

*In re R.H.B., L.M.B., and L.M.B.*, ¶ 19.

{¶ 39} We will not reverse the trial court's award of legal custody absent an abuse of discretion. *In re J.T.*, 2d Dist. Montgomery No. 27343, 2017-Ohio-1303, ¶ 10, citing *In re M.O.*, 2d Dist. Montgomery No. 26457, 2015-Ohio-2430, ¶ 7. An abuse of discretion has been defined as an attitude that is unreasonable, arbitrary or unconscionable. *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990), citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary. A decision is unreasonable if there is no sound reasoning

process that would support that decision." *Id.*

{¶ 40} As noted by the Ohio Supreme Court:

The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. *Trickey v. Trickey* (1952), 158 Ohio St. 9, 13, * * *, 106 N.E.2d 772, 774. In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct. See *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410, 461 N.E.2d 1273, 1276.

*Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988).

{¶ 41} We see no abuse of discretion in the juvenile court's decision to grant legal custody of M.J.H. to Aunt and Uncle. While Mother wished to reunify with her children, other factors in R.C. 3109.04(F) strongly supported the juvenile court's decision. Collins testified that the children were "most certainly" bonded to Aunt and Uncle and to their daughter, that they were adjusted to their home, and were "doing great." Collins testified that Aunt and Unlce's home was appropriate and that MCCS had no concerns. The children's needs were being met there, and Collins testified that it was in their best interest for the court to grant legal custody to Aunt and Uncle.

{¶ 42} As noted above, in January 2018, almost a year after Mother's case plan was put in place, caseworker Pitman averred in MCCS's motion for legal custody that

Mother was not cooperating with MCCS, that it was unknown if she had income or housing or was getting treatment, and that she appeared to be intoxicated at a meeting in August 2017, five months after her case plan was in place.

{¶ 43} Collins testified that Mother had an initial assessment at Crisis Care in August 2017 and failed to follow through with its recommendations, and that she only went for an assessment at TCN Behavioral Health in March 2018, a year after she committed to her case plan objectives and just days before the hearing.

{¶ 44} In her brief, Mother minimizes her substance abuse issues and the significance of her case plan objectives. While she asserts that she maintained stable housing for two years because the same address appeared on a February 2018 order and her February 2020 notice of appeal, the addresses were actually different. The February order listed "Apt. 1" at a Nottingham Road address, while Mother's notice of appeal listed "Apt. 3" at a different number on Nottingham Road. Mother testified that she had only lived with her boyfriend for a month and a half at the time of the hearing, and that prior to that time she had alternated between her mother's and boyfriend's mother's homes. Collins testified that the boyfriend's one-bedroom, sparsely furnished apartment was not appropriate for the children and had no furniture or supplies for them. While Mother indicated that she was willing to acquire a two-bedroom apartment, she had no income and was waiting to enter an in-patient treatment program of unknown duration.

{¶ 45} In her brief, Mother refers to "allegations" of her drug abuse. As noted above, M.H. tested positive for opiates at birth, endured symptoms of withdrawal, and was adjudicated abused due to Mother's drug abuse; Mother acknowledged using opiates the week before the hearing, as well as to their daily use until November 2017. In other

words, Mother's drug abuse was not a mere allegation and had been established.

{¶ 46} Mother further misapprehends her case plan objective regarding employment by characterizing it as "perfunctory" due to her boyfriend's "adequate support" of *her* (not her children). While it is clear that she will not obtain employment while in in-patient care, she only worked briefly from August to December 2017, and she testified that her employment was terminated because her drug use was reported to her employer. Finally, while Mother asserts that no evidence was presented that her drug use "interfered" with her ability to parent, this claim is rebutted by the facts that Mother failed to seek prenatal care for M.H., the child was born with drugs in her system, and both of her children were adjudicated dependent.

{¶ 47} For the foregoing reasons, we conclude that a preponderance of the evidence supported the juvenile court's decision that legal custody of M.J.H. to Aunt and Uncle was in her best interest. Mother's assignment of error is overruled, and the judgment of the juvenile court is affirmed.

. . . . . . . . . . . . .

TUCKER, P. J. and FROELICH, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Jamie J. Rizzo
Carl A. Lux
Candi Rambo
Father
Aunt and Uncle
Hon. Anthony Capizzi