[Cite as *In re D.S.*, 2014-Ohio-2444.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

IN THE MATTER OF: D. S.       :

             :    C.A. CASE NO.   2013 CA 51

             :    T.C. NO.   2010-1601

             :    (Civil appeal from Common
                  Pleas    Court,    Juvenile
Division)

             :

          . . . . . . . . . .

**O P I N I O N**

Rendered on the    6th    day of    June    , 2014.

. . . . . . . . . .

P. J. CONBOY II, Atty. Reg. No. 0070073, 5613 Brandt Pike, Huber Heights, Ohio 45424
   Attorney for Appellant

MARSHALL G. LACHMAN, Atty. Reg. No. 0076791, 75 N. Pioneer Blvd., Springboro,
Ohio 45066
   Attorney for Appellee

LESLIE S. BUCHANAN, Atty. Reg. No. 0023151, 50 E. Columbia Street, Springfield, Ohio
45502
   Attorney for Clark County Children Services

. . . . . . . . . .

FROELICH, P.J.

{¶ 1}     Mother[1] appeals from a judgment of the Clark County Court of Common Pleas, Domestic Relations Division, Juvenile Section, which granted legal custody of her son, D.S., to L.S., a family friend and D.S.'s temporary legal custodian.  The court's order further provided that Mother would have visitation with D.S. pursuant to the standard order of visitation.

{¶ 2}     For the following reasons, the judgment of the trial court will be affirmed

{¶ 3}     D.S., who was four years old at the time of the hearing, had lived with L.S. since he was two days old.  Mother and L.S. lived in Chicago at the time of D.S.'s birth, and, according to L.S., L.S. was like a mother to Mother.  L.S. "took on her (Mother's) cause" because L.S. "noticed [Mother] needed a lot of love."  Mother voluntarily left D.S. with L.S. after his birth.  Mother had consumed alcohol and/or marijuana while she was pregnant, and D.S. suffered some adverse effects at birth, including testing positive for marijuana.  After L.S. moved to Springfield approximately one year later, Mother and her two other children stayed with L.S. for more than a year, and L.S. helped to care for all of the children during that time.

{¶ 4}     In late 2009, Mother moved out of L.S.'s home to live with a boyfriend; she again left D.S. in L.S.'s care, but there was no formal custody arrangement.  In early 2010, Mother gave birth to her fourth child.  Family and Children Services of Clark County ("Children Services") became involved because the newborn tested positive for marijuana at

---

[1]This is the term used by the parties to describe the biological mother, and we will do likewise, for privacy reasons. We will use other parties' initials for the same reasons.

birth. Children Services was also involved with D.S. around this time "as an Alternate Response case"; after Mother brought D.S. to an emergency room on consecutive days, hospital staff raised concerns about her ability to administer medication properly or otherwise care for the child. In December 2010, Children Services filed a complaint for a dependency adjudication and for temporary shelter care of D.S.. As a result of this complaint, D.S. was placed in the temporary shelter care of L.S., and Mother's other children were placed in foster care. A case plan was developed, and Mother exercised visitation with D.S. and her other children.

{¶ 5} In 2012, Mother filed a Motion for Custody or reunification with all of her children. L.S. filed motion for legal custody of D.S. The trial court conducted a hearing in March and April 2013. Mother was reunified with her other children under protective supervision, but in May 2013, the trial court granted legal custody of D.S. to L.S.

{¶ 6} Mother appeals, raising one assignment of error.

**The trial court erred and abused its discretion when it granted legal custody of D.S. to [L.S.], a non relative.**

{¶ 7} Mother contends that the trial court erred in granting legal custody to L.S. because she (Mother) had completed her case plan objectives, had "properly handled the care of her other three children," and was able to handle D.S.'s care as well.

{¶ 8} R.C. 2151.353(A)(3) provides that if a child is adjudicated a dependent child, the court may award legal custody of the child "to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child[.]" An award of legal custody "vests in the custodian the right to have physical care

and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities." R.C. 2151.011(B)(19).

{¶ 9} When a juvenile court makes a custody determination under R.C. 2151.353, it must do so in accordance with the "best interest of the child" standard set forth in R.C. 3109.04(F)(1). See *In re Poling*, 64 Ohio St.3d 211, 594 N.E.2d 589, 1992-Ohio-144, paragraph two of the syllabus, and R.C. 2151.23(F)(1) (requiring a juvenile court to exercise its jurisdiction in accordance with R.C. 3109.04 as well as other sections of the Ohio Revised Code). The factors a court must consider in determining a child's best interest include such things as the parents' wishes; the child's wishes, if the court has interviewed the child; the child's interaction with parents, siblings, and others who may significantly affect the child's best interests; adjustment of the child to home, school, and community; and the mental and physical health of all involved persons. R.C. 3109.04(F)(1)(c). While "blood relationship" and "family unity" (i.e., a preference for a family member) are factors to consider when determining a child's best interest, neither one is controlling. *In re S.K.G.*, 12th Dist. Clermont No. CA2008-11-105, 2009-Ohio-4673, ¶ 12, citing, *e.g., In the Matter of Mitchell*, 11th Dist. Lake Nos. 2002-L-078, 2002-L-079, 2003-Ohio-4102, ¶ 18, and *In re T.W.*, 8th Dist. Cuyahoga No. 86084, 2005-Ohio-6633, ¶ 15.

{¶ 10} "[W]hen determining whether or not to grant an individual or couple legal custody of a dependent child, a court can do so if it finds by a preponderance of the evidence that it is in the best interests of the concerned child. Preponderance of the evidence simply

means 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.'" (Internal citations omitted.) *In re A.W.*, 2d Dist. Montgomery No. 21309, 2006-Ohio-2103, ¶ 6, citing [*In re K.S.*], 2d Dist. Darke No. 1646, 2005-Ohio-1912.

{¶ 11} We review the trial court's judgment for an abuse of discretion. *See In re C.F.*, 113 Ohio St.3d 73, 83, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48 (applying abuse of discretion standard to trial court's findings under R.C. 2151.414); *In re A.M.*, 2d Dist. Greene No. 2009 CA 41, 2009-Ohio-6002, ¶ 9. Abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 12} The following evidence was presented at the hearing.

{¶ 13} Dr. James Duffee, a pediatrician and child psychiatrist who treated D.S. at the Rocking Horse Center, had interacted with L.S. and D.S. 15 to 20 times in the previous year for well check visits, behavioral management, psychotherapy for D.S.'s "anxiety reactions," developmental delays, and "self regulation." Dr. Duffee stated his opinion that D.S.'s developmental delays related to suspected "intrauterine exposure to substances."

{¶ 14} Dr. Duffee testified that D.S. had a maternal bond with L.S., found "security in her presence," and suffered a "tremendous amount of anxiety when he [was] separated from her." His anxiety over separation from L.S., whom he "identifies * * * as mom," for visits with Mother was one focus of the treatment. According to Dr. Duffee, L.S. was engaged and appropriate in her interactions with D.S. and consistent, devoted, and "firm" in her discipline; she met his emotional and medical needs. Dr. Duffee stated that

D.S. had problems with self-discipline, was likely to have "difficulty with language acquisition," and that an ADHD diagnosis was "almost certain" as he gets older. Dr. Duffee described D.S. as a "very challenging little boy" who took some behavioral medications to address his "difficulty with self regulation, early onset ADHD, [and] learning disabilities" and who would "very likely benefit from psychiatric care throughout his school years."

{¶ 15} With respect to D.S.'s relationship with Mother, Dr. Duffee recognized that Mother had attempted to form a relationship with D.S., but stated that, as the frequency of visitation increased, D.S.'s separation anxiety also increased, with manifestations such as bed-wetting. Dr. Duffee described D.S. as "a boy with very little resilience," who is particularly vulnerable and does not handle insecurity well. He observed that D.S. has "long-standing maternal child relationship with [L.S.] that I think would be – that if this were disrupted, it would be very harmful for him," and may influence whether he is able to form trusting relationships in the future. Dr. Duffee opined that a break of the parental bond between D.S. and L.S. "would have a strong, lifelong deleterious harm" on D.S.

{¶ 16} Megan Harcourt worked at the Rocking Horse Center at the time of the hearing and was a former caseworker involved with this case for Children Services for 2½ years. She testified that Mother's case plan called for mental health services, counseling for Mother and the children, drug and alcohol services, and addressing the children's behavioral needs. Harcourt stated that Mother completed the case plan objectives, and the three children in foster care were returned to her care in July 2012. She further testified that D.S. had developed some connection with his siblings during the time that they had lived together (with L.S.) and during Mother's visits with all of her children every other week. She stated

that Children Services had not opposed D.S.'s reunification with Mother.

{¶ 17}  Sherri Ann Grimone, a child family therapist at the Rocking Horse Center, had participated in 72 sessions with L.S. and D.S., as well as 10 sessions with Mother and D.S., to address D.S.'s separation issues (when separated from L.S.) and his other struggles. She testified that L.S. was very nurturing, loving, and firm with D.S.  She stated that D.S. had cognitive and speech delays, that he acted younger than his age emotionally, and that he was not "on target" for his age.  According to Grimone, D.S. enjoyed time with his siblings and Mother, but had a stronger tie with L.S.  D.S. had recounted some inappropriate sexual behavior with an older sibling while visiting with Mother, and behaved aggressively when he returned from visitation.

{¶ 18}  Mother, age 25, testified that she had moved to Columbus with her fiancé while this case was pending; she was not employed, had never held a job, received SSI, and did not drive. She was unable to identify the condition or diagnosis for which she received SSI.  Mother recounted the circumstances of D.S.'s birth, acknowledged her drug and/or alcohol problem at that time, and admitted that D.S. tested positive for marijuana at birth. Mother also acknowledged that D.S. had lived with L.S., with her consent, since his birth. During approximately 1½ years of D.S.'s life, Mother also lived with L.S. and helped with D.S.'s care.  Mother stated that she had been hampered in caring for D.S. by her addictions and past abusive relationships.  Her other children had been cared for by their godmothers and grandmothers for some periods of time.

{¶ 19}  Mother stated that she visited with D.S. and her other children while they were not in her custody; these visits consisted of weekends at her home every other

weekend. She was also allowed several hours of visitation on the alternate weekends, but Mother had not been exercising this visitation with D.S. since moving to Columbus. Mother testified that her other children were seeing a therapist in Columbus, but she could not remember the therapist's name. She stated that she smokes cigarettes, despite the fact that some of the children have asthma; she asserted that she rolls down the windows if she smokes in a car with the children and that she smokes in a different room from the children at home. She stated that she had been to a residential treatment program for her drug use and that she no longer smoked marijuana.

{¶ 20} Two of the children in Mother's custody at the time of the hearing had IEPs and "special needs." She did not remember the name of their school or the specific requirements of the IEPs.

{¶ 21} Mother acknowledged that D.S. "always" screams when she comes get him for visitation, but stated that he was fine after the first few minutes. She downplayed any potential problems with switching D.S.'s counselors and school by moving him to Columbus, stating that "all kids have problems" in a new school. Overall, Mother believed that it was in D.S.'s best interest to be with her and that she can "take care of his needs." Mother expressed a desire to have a close bond with D.S., but acknowledged that he was closely bonded with L.S. Mother believed "it would be the same" if D.S. lived with her.

{¶ 22} Sharon Hockman, the guardian ad litem and a CASA advocate, recommended that legal custody be awarded to L.S., with continued visitation with Mother and D.S.'s siblings. She testified that D.S.'s speech had "incredibly improved" since she first became involved in the case, that he (D.S.) has had a lot of consistent help from L.S.

and school programs, and that he had made an excellent adjustment to his school. Hockman stated that D.S. identifies L.S.'s husband as a father figure. She recognized that D.S. was very bonded with his siblings, and credited L.S. with making those relationships a priority. Hockman testified that L.S. provides a consistent schedule and loving contact for D.S. and met his physical and emotional needs.

{¶ 23} Hockman further testified that Mother moved to Columbus while this case was pending and talks about moving to Chicago. Addressing how such moves would affect D.S., Hockman stated that D.S. has "special needs" and is "very fragile," and that small disruptions in his routine "set him off" and present difficult adjustment issues. Based on her observations of Mother with all the children, she also observed that Mother "had difficulty keeping track of all the children and what their activities are, whether they're [in] a safe situation or not." For example, Hockman had observed a medication bottle on the floor of the house with medication inside. She also noted that Mother smokes and, while Mother claimed to smoke only outside, there were "always multiple ashtrays full of cigarettes sitting around the house," despite that fact that some of the children have asthma. Mother had had no interaction with D.S.'s teacher and had not expressed a desire to know how he was doing in school. Hockman did not think Mother was "capable of caring for the other three children who also have needs, plus [D.S.], who is a fragile child." Finally, Hockman testified that D.S. was "extremely" bonded with L.S. and that their separation would cause him "extreme emotional distress."

{¶ 24} L.S. testified that D.S. lived with her since he was two days old, because she had developed a mother-daughter type of relationship with Mother in Chicago. D.S.

received occupational and speech therapy in her care and rode horses for therapy, but he acted out when anything changed in his life. L.S. noted that D.S. had exhibited some sexual acting out after a visit with Mother based on an encounter with one of his older siblings but, after increased counseling, this behavior "leveled out." L.S. expressed doubt about Mother's ability to succeed in caring for all four of her children, considering their "special needs." L.S. had previously raised four other children from birth to adulthood.

{¶ 25} The trial court found that Mother was "challenged and limited in her own regard" and had been unable to meet the needs of her children in the past. It also found that Mother's home "is beset with instability and she finds it difficult to manage the needs of the three children that are currently in her home." Mother was not well versed in D.S.'s conditions or medications and did not have contact with his teachers. On the other hand, the trial court concluded that D.S. was a "happy capable child" in L.S.'s care, that they were bonded, and that his speech had improved. L.S. "provides the consistency and the stability that this child desperately needs." The court acknowledged D.S.'s close bond with his siblings, but observed that D.S. had adapted well to living separately from them. D.S. had lived with L.S. from birth, and several witnesses testified that he was ill-equipped to deal with significant changes in his life. The trial court reasonably concluded that it was in D.S.'s best interest to award legal custody to L.S. and to award visitation to Mother.

{¶ 26} The assignment of error is overruled.

{¶ 27} The judgment of the trial court will be affirmed.

. . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies mailed to:

P. J. Conboy II
Marshall G. Lachman
Leslie S. Buchanan
Hon. Joseph N. Monnin