[Cite as *In re J.C.*, 2020-Ohio-5540.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

|  |  |  |
|---|---|---|
| IN RE: J.C. & C.J.H. | : | Appellate Case No. 28847 |
|  | : |  |
|  | : | Trial Court Case Nos. 2018-1651 |
|  | : | 2018-1652 |
|  | : |  |
|  | : | (Appeal from Common Pleas |
|  | : | Court – Juvenile Division) |
|  | : |  |

. . . . . . . . . . .

O P I N I O N

Rendered on the 4th day of December, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LISA M. LIGHT, Atty. Reg. No. 0097348, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Appellee, MCCS

ANN RATCLIFF, Atty. Reg. No. 0009059, 919 Greatview Circle, Apt. D., Dayton, Ohio 45459
    Attorney for Appellant, Mother

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Mother appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which granted legal custody of her sons, J.C. and C.J.H. to Maternal Grandfather and Step-Grandmother. For the following reasons, the trial court's judgment will be affirmed.

## I. Procedural History

{¶ 2} Mother has two sons: C.J.H., born in January 2003, and J.C., born in August 2010. C.J.H.'s father has not expressed interest in parenting his son. J.C.'s father was sentenced to prison in 2018 and is scheduled to be released in August 2021.

{¶ 3} According to the neglect and dependency complaints, the Montgomery County Department of Job and Family Services - Children Services Division ("MCCS") received a referral about this family on November 16, 2017, alleging that Mother was not sending her children to school. The children's school withdrew the children from the school on October 10, 2017, after they had 105 continuous hours of unexcused absences. Mother told MCCS that C.J.H. has been suspended multiple times and had been recommended for expulsion. Mother admitted to MCCS that neither child had been in school since October 2017. Mother would not explain the children's absences or cooperate with MCCS. She had previously been convicted of failure to send a child to school (twice) and of educational neglect.

{¶ 4} MCCS created a case plan for Mother in November 2017. On April 10, 2018, MCCS filed neglect and dependency complaints with the above allegations. The complaints requested temporary custody to Maternal Grandfather and Step-Grandmother. The trial court appointed a guardian ad litem for the children.

{¶ 5} On May 18, 2018, the magistrate held a hearing on the complaint. The same day, the court adjudicated C.J.H. and J.C. to be dependent and neglected and granted legal custody of the children to Maternal Grandfather and his wife. The order was effective until February 16, 2019.

{¶ 6} On January 18, 2019, MCCS moved for the court to grant legal custody of the children to Maternal Grandfather and Step-Grandmother, with an accompanying affidavit. The GAL also recommended legal custody to Maternal Grandfather. On February 5, the parties appeared before the magistrate, and the court conducted a brief annual review hearing. The court ordered that an attorney be appointed for the children, and the hearing on MCCS's motion was continued until March 26.

{¶ 7} On February 8, MCCS filed an amended motion, again seeking legal custody to Maternal Grandfather and his wife or, alternatively, an extension of temporary custody to those relatives. MCCS filed an updated affidavit to accompany the amended motion.

{¶ 8} On March 5, counsel for the children filed a motion for an in camera interview with the children. The magistrate apparently conducted an in camera interview with C.J.H., but not with J.C. The guardian ad litem provided an updated report, indicating that C.J.H. wanted to return to Mother and he believed that J.C. also wanted to return. J.C., who had been described as "painfully shy" and unwilling to engage verbally with most people, would not speak with the GAL or his attorney to provide his views.

{¶ 9} On March 26, 2019, the magistrate conducted a hearing on the motion for legal custody, during which Mother's caseworker testified. The magistrate concluded that granting legal custody to Maternal Grandfather and Step-Grandmother was in the children's best interest, and the magistrate granted legal custody to them. The

magistrate granted Mother overnight visitation on one weekend per month.

{¶ 10} Mother objected to the magistrate's decision, claiming that the magistrate's decision was against the weight of the evidence and was an abuse of discretion. In her supplemental objections, Mother also raised that the magistrate should have considered an extension of temporary custody and that the order of visitation, which reduced visitation drastically, was an abuse of discretion.

{¶ 11} Upon reviewing the record, including the transcripts of the March 26, 2019 hearing on the motion for legal custody, the February 5, 2019 hearing, and the GAL report, the trial court overruled Mother's objections and awarded legal custody of C.J.H. and J.C. to Maternal Grandfather and Step-Grandmother.

{¶ 12} Mother appeals from the trial court's judgment. Her sole assignment of error claims that the trial court's grant of legal custody of the children to Maternal Grandfather and Step-Grandmother was against the weight of the evidence and an abuse of discretion.

## II. Standard for Grant of Legal Custody

{¶ 13} An award of legal custody "vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities." R.C. 2151.011(B)(21); *see In re D.S.*, 2d Dist. Clark No. 2013-CA-51, 2014-Ohio-2444, ¶ 8. Unlike an award of permanent custody, however, "[a]n award of legal custody of a child does not divest parents of their residual parental rights, privileges, and responsibilities." *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191,

843 N.E.2d 1188, paragraph one of the syllabus.

{¶ 14} R.C. 2151.353(A)(3) provides that if a child is adjudicated a dependent child, the court may award legal custody of the child "to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child[.]"   A juvenile court may award legal custody of a child to an individual if the court finds, by a preponderance of the evidence, that legal custody is in the best interest of the child. *In re C.B.*, 2d Dist. Montgomery No. 28113, 2019-Ohio-890, ¶ 17, citing *In re M.O.*, 2d Dist. Montgomery No. 26457, 2015-Ohio-2430, ¶ 7.

{¶ 15} When making a legal custody determination under R.C. 2151.353, the juvenile court must apply the "best interest of the child" standard set forth in R.C. 3109.04(F)(1). *In re A.F.*, 2018-Ohio-310, 103 N.E.3d 1260, ¶ 52 (2d Dist.), citing *In re D.S.* at ¶ 9; *In re Poling*, 64 Ohio St.3d 211, 594 N.E.2d 589 (1992), paragraph two of the syllabus; R.C. 2151.23(F)(1).   The factors a court must consider in determining a child's best interest include such things as:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers * * *, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

* * *

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; * * * and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

* * *

{¶ 16} An appellate court will not reverse an award of legal custody absent an abuse of discretion by the juvenile court. *Id.* The term "abuse of discretion" implies that the juvenile court's decision is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

### III. Evidence Presented

{¶ 17} Caseworker Ashley Stahl testified at the February 5, 2019 hearing; Caseworker Beth Pfoutz testified at the March 26, 2019 hearing. The record indicates that Stahl was the family's caseworker from 2017 until December 2018, at which time Pfoutz became the family's caseworker. The record in this case established the following facts.

{¶ 18} MCCS's involvement with Mother began in November 2017 due to allegations of educational neglect. MCCS created a case plan for Mother, which included the requirements that Mother (1) obtain and maintain stable housing and income,

(2) verify her income was sufficient to meet the needs of the children, (3) actively participate in the children's education, such as by attending school meetings and parent/teacher conferences, contacting the school bi-weekly for updates, and transporting her children to school, (4) complete a mental health assessment, (5) comply with her probation on truancy charges, (6) maintain ongoing visitation with the children, (7) cooperate with home visits and meetings with the caseworker, and (8) sign releases of information.

{¶ 19} At the February 5, 2019 hearing, Stahl testified that Mother had been in the same home throughout the pendency of the case. The home was a three-bedroom ranch. Stahl did not express any concerns about Mother's housing. At the March 26 hearing, Pfoutz testified that Mother used one bedroom, that Maternal Grandmother was living in a second bedroom with a hospital bed, and that the third bedroom did not have sufficient furniture for the two boys. Mother told Pfoutz that she had a mattress and box spring in the garage, that C.J.H. could use her bedroom, and that she could sleep on a couch in the living room. Pfoutz was aware, however, the Mother had issues with her back, and Pfoutz had concerns that a child would sleep in the living room.

{¶ 20} Pfoutz testified that there had been times when Mother had met with MCCS willingly and other times when scheduling and completing home visits had been "a little struggle." Pfoutz indicated that sometimes the caseworker was successful at meeting Mother at the home and sometimes not. There were times when Mother had cancelled the home visits, citing a job opportunity or illness.

{¶ 21} Mother told caseworkers that she worked by cleaning homes for individuals and doing some subcontracting for a company, but she did not provide verification of

sufficient income or details about the terms of her employment. Mother told Pfoutz that she had a second job as a phlebotomist at a hospital, but Mother expressed discomfort with the hospital's being asked for verification of her employment.

{¶ 22} Mother completed a mental health assessment, and no recommendations were made for Mother.

{¶ 23} The caseworkers testified they repeatedly emphasized to Mother that Mother's participation in the children's education was the primary feature of the case plan. When asked in February 2019 whether Mother had been following through or participating in the children's education, Stahl responded, "[O]nly recently has she really started to do that within the past month." Stahl stated that Mother had attended meetings with respect to C.J.H., including an IEP meeting. MCCS recommended that Mother walk with J.C. to school in the morning and home in the afternoons; Stahl reported that Mother did that a couple times, but has not continued with that.

{¶ 24} Pfoutz testified in March 2019 that Mother had attended school meetings, primarily for C.J.H. due to his having more academic struggles. Pfoutz indicated that in late February 2019, the parties agreed to a schedule where Mother would transport J.C. to and from school on a daily basis and transport C.J.H. to his tutoring twice per week. The schedule also included regular weekly visitation on Fridays, Saturdays, and Sundays. Pfoutz testified that Maternal Grandfather reported that Mother was not consistently following this schedule. Pfoutz acknowledged that one or more times may have been due to Mother's or a child's illness.

{¶ 25} Pfoutz further testified that Mother had expressed "a great deal of frustration" about MCCS's involvement. Mother had made several statements, including

shortly before the March 2019 hearing, that she did not believe the family's circumstances warranted the boys' removal from her home or the court's involvement. Mother compared herself to people who struggle with drug addiction, stating that they had been given more opportunities to reunify with their children than she had. Pfoutz testified that MCCS had concerns about whether Mother realized the significance and importance of her sons' education and the need for follow-through, and whether Mother would return to her prior lifestyle that led to MCCS's involvement. Pfoutz stated that Mother, at times, said that she understood, but would also misdirect responsibility for the situation onto other family members.

{¶ 26} Mother had consistently visited with the children. Both caseworkers noted, however, that Maternal Grandfather had reported that Mother would schedule a time to pick up the children, but she would not pick them up when she said (the time would be "pushed back") and she would not bring them back at the scheduled time. The caseworkers indicated that communication between Mother and Maternal Grandfather had been difficult.

{¶ 27} Stahl stated that she did not have concerns about the children being with Mother overnight, provided that the visits did not disrupt the children's education. Stahl noted that, prior to MCCS's involvement, the children stayed up all night, slept all day, and missed school. However, MCCS did not require Mother to attend a parenting class, and it did not refer Mother to one. Both caseworkers acknowledged that Mother and the children were "very much bonded." C.J.H. expressed that he wanted to reunite with Mother and believed J.C. wanted to reunite as well.

{¶ 28} Stahl testified in February 2019 that Mother had not complied with the

probation requirement in a criminal case that she obtain a substance abuse assessment. Stahl repeatedly encouraged Mother to obtain the required assessment. Stahl indicated that she did not believe that Mother used drugs.

{¶ 29} The caseworkers reported that the children were doing well with Maternal Grandfather and Step-Grandmother. J.C. repeated second grade due to his absences from school, but he was excelling academically and socially at the time of the hearing. J.C. enjoyed school and was doing well. J.C. had become involved with gymnastics. Pfoutz indicated that J.C. was mostly non-verbal, but "was very excited to give me a thumbs up on the fact that he moved to the next level" at gymnastics.

{¶ 30} C.J.H. had struggled in school, and his grandparents had taken steps to have him evaluated for special education. C.J.H. had an IEP for emotional disturbance. When C.J.H. first returned to school, C.J.H. would walk out of class and disappear, resulting in phone calls to Maternal Grandfather. For a time, C.J.H. was placed in a partial hospitalization program, until the program stopped operating. In an effort to assist C.J.H. in adjusting to the academic structure without overwhelming him, C.J.H. attended school part-time in the morning and worked with a tutor in the afternoons. C.J.H. was doing better in a public school setting. C.J.H. was also enrolled in credit recovery to make up for lost credits. C.J.H. had been encouraged to select a specific extracurricular activity, but he had not done so. C.J.H. spent a lot of time playing with his brother and listening to music.

{¶ 31} Pfoutz testified that MCCS believed that Maternal Grandfather and his wife could provide the consistency and routine that would allow the children to do well. MCCS did not believe that Mother was able to provide this routine and schedule. Pfoutz testified

that MCCS was requesting legal custody of the children to Maternal Grandfather and Step-Grandmother, and that the agency believed that legal custody to those relatives was in the boys' best interest.

{¶ 32} The GAL filed a report with the trial court, in which he recommended that legal custody of the boys be given to Maternal Grandfather and his wife. The GAL repeated that recommendation at the conclusion of the March 26, 2019 hearing.

## IV. Review of Trial Court's Ruling

{¶ 33} The trial court found, by a preponderance of the evidence, that legal custody of J.C. and C.J.H. to Maternal Grandfather and Step-Grandmother was in the children's best interest. The trial court reasoned:

> The credible testimony established that Mother failed to meet several of her case plan objectives. Perhaps most importantly, Mother has not made her children's education a priority. O.R.C. § 2151.03(A)(3) defines a neglected child as any child "whose parents, guardian or custodian neglects the child or refuses to provide proper or necessary subsistence, *education*, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well-being." Consistent with this definition, Mother's failure to properly provide for her children's education truly stems back to 2013 and was most recently called into question in 2017; the time she last chose to send her children to school. The Court recognizes and appreciates that a mutual bond exists among Mother and her children however; the children need strong reinforcement about the importance of education and attending school. Despite having ample time, Mother has not demonstrated her

ability to provide the requisite reinforcement to her children[.]

(Emphasis sic.)

{¶ 34} The trial court further found that the children "need to continue residing in a safe and stable home environment and are in need of a legally secure and permanent placement, which legal custody achieves."  The court noted that the children had made progress in their placement with Maternal Grandfather and his wife and their needs were being met with success.   The court found by clear and convincing evidence that MCCS had made reasonable efforts to prevent the removal of the children from their home, to eliminate the continued removal of the children, or to make it possible for the children to return home safely.

{¶ 35} The trial court recognized that R.C. 2151.415(D)(1) permitted MCCS to request an extension of temporary custody and that MCCS made that request as an alternate disposition.   The court found, however, by clear and convincing evidence, that an extension of temporary custody was not in the children's best interest.   The court stated that Mother had made minimal progress on her case plan and, despite prior involvement with the court regarding educational neglect, Mother "continuously lacks an understanding of the importance of her children's education."

{¶ 36} After reviewing the factors in R.C. 3109.051(D), the trial court granted parenting time consisting of overnight visits one weekend per month from Friday 6:00 p.m. until Sunday 6:00 p.m.

{¶ 37} Upon review of the record, the trial court's ruling was neither against the weight of the evidence nor an abuse of discretion.   MCCS became involved with the family in 2017 based on Mother's alleged failure to meet the educational needs of her

children; she had previously been convicted three times of offenses related to educational neglect.

{¶ 38} At the March 26, 2019 hearing, Mother's caseworker testified that Mother continued to express frustration that the court system was involved and did not believe that the circumstances had warranted the removal of her children from her home. Mother had complied in certain respects with the educational aspect of the case plan, but only approximately one month prior to the legal custody hearing did the parties reach an agreement whereby Mother would be extensively involved in taking her children to and from school and tutoring. The trial court reasonably concluded that Mother "continuously lacks an understanding of the importance of her children's education," which was the primary concern for this family.

{¶ 39} In addition, the trial court reasonably concluded that Mother had not adequately progressed on her case plan. Mother did not provide documentation of her employment and income. Although her three-bedroom home was sufficient for the family, she did not have adequate bedroom furniture for the children. Mother had not complied with a condition of her probation in a criminal case that she obtain a substance abuse assessment.

{¶ 40} It is apparent from the record that Mother loved her children and her children were bonded to her. Mother claims on appeal that the trial court failed to consider the children's wishes. Contrary to Mother's assertion, the trial court noted the bond between Mother and her sons. The court further recognized that C.J.H. expressed his desire to reunify with Mother and, despite J.C.'s unwillingness to communicate directly with the caseworkers, that J.C. also wanted to reunify with Mother.

{¶ 41} The record further shows that the children were well cared for in Maternal Grandfather's home, and they were doing well there. J.C. was excelling academically and enjoying gymnastics. C.J.H. had struggled more educationally, but Maternal Grandfather had worked to find ways to integrate C.J.H. back into school, and C.J.H. was doing better with his school schedule. Both children benefitted from the routine and consistency that Maternal Grandfather and his wife provided, and MCCS questioned whether Mother could provide that routine and consistency. The GAL recommended that legal custody be given to Maternal Grandfather and his wife. The trial court did not abuse its discretion in concluding that legal custody to Maternal Grandfather and his wife was in C.J.H.'s and J.C.'s best interest and in granting legal custody of the children to them.

{¶ 42} In her appellate brief, Mother repeatedly raises that the only witnesses to testify at the February 5 and March 26, 2019 hearings were the caseworkers. We must review the trial court's decision based on the evidence before us, and we cannot speculate what additional information would have been provided had Mother, Maternal Grandfather, Mother's probation officer, and others testified. Moreover, pursuant to Juv.R. 34(B)(2), hearsay testimony is permitted at dispositional hearings, with the exception of hearings for permanent custody. *See, e.g., In re A.E.*, 9th Dist. Lorain No. 17CA011192, 2018-Ohio-2349, ¶ 12. With the evidence before us, the trial court's decision was not an abuse of discretion.

{¶ 43} Mother argues that the trial court should have extended temporary custody rather than granting legal custody to Maternal Grandfather and his wife. At the March 26, 2019 hearing, counsel for Mother elicited testimony that Mother had made additional strides to assist in the education of her children since the parties reached an agreement

in late February 2019 regarding visitation and transportation. However, Mother's case plan had been in effect since November 2017, and Mother continued to minimize the import of her conduct leading to MCCS's involvement, even in 2019. We cannot conclude that the trial court erred in determining that an extension of temporary custody was not in the children's best interest.

{¶ 44} Finally, Mother argues that the trial court abused its discretion in decreasing the amount of visitation to one overnight weekend visit per month. Pursuant to the parties' agreement in late February 2019, when the goal was reunification of the family, Mother saw the children multiple times during the week as she participated in transporting them to and from school and tutoring, and Mother had weekly visitation on weekends. Mother asks that we modify the visitation order to provide more opportunities for her to maintain her relationship with her children and to have positive interactions with them.

{¶ 45} The trial court applied the factors in R.C. 3109.051(D) and determined that "it is in the best interest of the children to grant Mother parenting time." The court did not specifically explain how it determined the amount of parenting time that Mother received. It noted that MCCS did not have concerns about Mother's receiving parenting time, except to the extent that it might interfere with the children's ability to attend school on a regular basis. The trial court could have reasonably concluded that visitation throughout the week would interfere with the children's school routine and that overnight visitation (which Mother had not previously had) for a weekend a month would allow Mother and her sons to have meaningful contact without disrupting the boys' routines. We note that nothing in this opinion precludes Mother from requesting a modification of parenting time.

{¶ 46} Mother's assignment of error is overruled.

# V. Conclusion

**{¶ 47}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

TUCKER, P. J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Lisa M. Light
Ann Ratcliff
Jivanto Vanhemert, GAL
J.H & L.H.
J.C.
L.C.
Hon. Anthony Capizzi