**[Cite as *In re P.W.*, 2026-Ohio-1478.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

|  |  |  |
|---|---|---|
| IN RE: P.W. | : | |
| | : | C.A. No. 30671 |
| | : | |
| | : | Trial Court Case No. G-2024-000335-0F,0I |
| | : | |
| | : | (Appeal from Common Pleas Court-Juvenile Division) |
| | : | |
| | : | **FINAL JUDGMENT ENTRY & OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on April 24, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
ROBERT G. HANSEMAN, JUDGE

EPLEY, J., and HUFFMAN, J., concur.

OPINION

ROBERT ALAN BRENNER, Attorney for Appellant, Mother
JONATHAN D. MURRAY, Attorney for Appellee Montgomery County Department of Job and Family Services, Children Services Division
GARY C. SCHAENGOLD, Attorney for Appellee Father

HANSEMAN, J.

{¶ 1} Appellant-Mother appeals from a judgment of the Juvenile Division of the Montgomery County Common Pleas Court that granted legal custody of her child P.W. to Father following an adjudicatory hearing finding the child neglected and dependent. Mother claims the trial court abused its discretion in determining that it was in P.W.'s best interest to grant legal custody to Father. For the following reasons, the trial court's judgment is affirmed.

**I. Facts and Course of Proceedings**

{¶ 2} P.W. was born in April 2019 to Mother, an unmarried woman. After P.W.'s birth, Father made efforts to see P.W. by contacting Mother regularly; however, Mother was inconsistent in returning calls or facilitating contact. Father periodically dropped gifts off for P.W. and provided Mother with continuous monthly financial support. But due to Mother's lack of contact with Father, he had minimal contact with P.W. during her first five years of life.

{¶ 3} In December 2023, the Montgomery County Department of Job and Family Services, Children Services Division ("MCCS") received a case referral concerning Mother, which alleged that she abused illegal substances and was not adequately caring for the children. Mother's home was also reported to be filthy. Besides P.W., Mother had twins younger than P.W. and two other children older than P.W. When MCCS attempted contact

with Mother, she was uncooperative. After six failed attempts, in January 2024, MCCS attempted contact using law enforcement officers. Mother allowed the officers inside, but she refused MCCS entry.

{¶ 4} Mother's home lacked smoke detectors and was in filthy condition. Officers saw feces, dirty diapers, and other unclean and unsanitary conditions throughout the home. A stained mattress was laying on the living room floor, and Mother indicated it was her bed, which she shared with some of the children. Code enforcement arrived and condemned the home. Mother appeared under the influence, had an active warrant, and was arrested. Physical injuries were visible on the twins, and they were taken to the hospital. Later, Mother was charged with endangering children. P.W. and one of her older siblings were placed with Maternal Grandmother.

{¶ 5} On January 22, 2024, MCCS filed a neglect and dependency complaint, and after a hearing in April 2024, P.W. was adjudicated neglected and dependent. MCCS was granted temporary custody and put together a case plan for Mother. Father expressed interest in having contact with P.W., and MCCS provided Father with objectives to complete.

{¶ 6} While P.W. was in the care of Maternal Grandmother, Mother maintained all scheduled visits with P.W. and fixed the conditions of her home. However, around November 2024, Mother violated conditions of community control in a criminal case and had a drug possession related criminal case. Around the same time, in Mother's community control case, she was court ordered to complete a residential drug treatment program, which prevented her from maintaining in-person visits with P.W. Mother did, though, maintain regular contact with P.W. through telephone and FaceTime. Mother's residential treatment program lasted approximately six months and ended in April 2025. Thereafter, she ejected

squatters from her home. She did not complete an MCCS home study prior to the hearing regarding P.W. in April.

{¶ 7} Regarding Father, he completed a mental health, drug, and alcohol assessment and a home study, with no concerns reported. Father also began visitations with P.W. at Maternal Grandmother's home. Father's visits progressed to twice a week and, over time, to full-weekend visits in his home.

{¶ 8} On November 27, 2024, MCCS filed a motion for extension of temporary custody of P.W. On December 19, 2024, Father filed a motion for legal custody of P.W., and on April 11, 2025, MCCS also filed a motion for Father to have legal custody. The dispositional hearing on the motions took place on April 23, 2025. The juvenile court heard evidence from an MCCS caseworker, Father, and Maternal Grandmother. Mother was at the hearing with counsel, but she did not testify. The guardian ad litem ("GAL") for P.W. was also present and recommended legal custody to Father.

{¶ 9} On May 2, 2025, the magistrate issued a written decision granting Father legal custody of P.W., with Mother to have no less than two hours of parenting time per week. The juvenile court adopted the magistrate's decision. Mother timely objected, and after all parties briefed the issues, the juvenile court conducted an independent review and overruled Mother's objections on October 30, 2025. The juvenile court determined that the magistrate's decision was not against the manifest weight of the evidence and that granting legal custody to Father was in the best interests of P.W. This appeal followed.

**II. Mother's Assignment of Error**

{¶ 10} In her appeal, Mother raises a single assignment of error.

THE JUVENILE COURT ABUSED ITS DISCRETION WHEN IT GRANTED LEGAL CUSTODY TO FATHER.

4

In her issue presented for review, Mother asks "[w]hether the juvenile court abused its discretion when it granted legal custody to father who had not been involved in P.W.'s life until this juvenile case was opened."

### III. Legal Custody

{¶ 11} "Legal custody is significantly different from, and not as drastic a remedy as, the termination of parental rights . . . ." *In re S.P.*, 2021-Ohio-4335, ¶ 13 (2d Dist.). "An award of legal custody of a child does not divest parents of their residual parental rights, privileges, and responsibilities." *In re C.R.*, 2006-Ohio-1191, paragraph one of the syllabus.

{¶ 12} The Revised Code defines "legal custody" as "a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities." R.C. 2151.011(B)(21). Only a permanent custody determination would divest Mother of all parental rights, privileges, and obligations, including all residual rights and obligations. *See* R.C. 2151.011(B)(31) (defining "permanent custody").

{¶ 13} "R.C. 2151.353(A)(3) provides that if a child is adjudicated a dependent child, the court may award legal custody of the child 'to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child.'" *In re J.C.*, 2020-Ohio-5540, ¶ 14 (2d Dist.), quoting R.C. 2151.353(A)(3). In order for a juvenile court to award legal custody of a child to a parent, or other individual, the court must find that legal custody is in the best interest of the child by a preponderance of the evidence. *Id.*, citing *In re C.B.*, 2019-Ohio-890, ¶ 17 (2d Dist.), citing *In re M.O.*, 2015-Ohio-2430, ¶ 7 (2d Dist.). "'Preponderance of the evidence simply means "evidence which is of a greater

5

weight or more convincing than the evidence which is offered in opposition to it.'"'" *S.P.* at ¶ 13 (2d Dist.), quoting *In re Starks*, 2005-Ohio-1912, ¶ 15 (2d Dist.), quoting *Black's Law Dictionary* (6th Ed. 1998).

{¶ 14} "When making a legal custody determination under R.C. 2151.353, the juvenile court must apply the 'best interest of the child' standard set forth in R.C. 3109.04(F)(1)." *J.C.* at ¶ 15, citing *In re A.F.*, 2018-Ohio-310, ¶ 52 (2d Dist.), citing *In re D.S.*, 2014-Ohio-2444, ¶ 9 (2d Dist.)' *In re Poling*, 64 Ohio St.3d 211 (1992), paragraph two of the syllabus; *In re G.D.*, 2023-Ohio-1913, ¶ 9 (2d Dist.).

{¶ 15} R.C. 3109.04(F)(1) provides the following non-exhaustive list of factors to consider in determining the best interest of a child: (a) the wishes of the child's parents; (b) the wishes and concerns of the child; (c) the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (d) the child's adjustment to the child's home, school, and community; (e) the mental and physical health of all persons involved in the situation; (f) the parent more likely to honor and facilitate court-approved parenting time rights or visitation; (g) whether either parent has failed to make all child support payments; (h) whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused or neglected child; (i) whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court; and (j) whether either parent has established a residence, or is planning to establish a residence, outside this state. R.C. 3109.04(F)(1). "Under the best-interest test, no single factor is controlling, and the weight to be given to any

factor lies within the trial court's discretion." *In re Z.C.*, 2023-Ohio-963 34 (2d Dist.), citing *In re L.L.*, 2020-Ohio-5609, ¶ 8 (1st Dist.).

**IV. The juvenile court did not abuse its discretion when it granted legal custody of P.W. to Father because the juvenile court considered the statutory factors in R.C. 3109.04(F)(1) and determined that it was in P.W.'s best interest.**

{¶ 16} When reviewing a juvenile court's order of legal custody, we apply an abuse of discretion standard of review. *A.F.*, 2018-Ohio-310, at ¶ 54 (2d Dist.). An abuse of discretion means that the juvenile court's decision is unreasonable, arbitrary or unconscionable. *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary. A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

{¶ 17} The Ohio Supreme Court has stated:

The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. *Trickey v. Trickey* (1952), 158 Ohio St. 9, 13, 47 O.O. 481, 483, 106 N.E.2d 772, 774. In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct. See *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410, 461 N.E.2d 1273, 1276.

7

*Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988).

{¶ 18} In her argument, Mother asserts that because P.W. was with her and Maternal Grandmother her whole life and because Father was a stranger up until the MCCS intervention, it was an abuse of discretion to award Father legal custody over reunification with Mother. While not specifically stated, it appears Mother argues that since she was P.W.'s primary caregiver for the first five years of P.W.'s life, the juvenile court abused its discretion in awarding legal custody to Father.

{¶ 19} Regarding the primary caregiver, we have stated that a court is not limited to the listed factors in R.C. 3109.04(F)(1) and should consider any other relevant factor, including which parent is the child's primary caregiver. *In re Maxwell*, 8 Ohio App.3d 302, 306 (2d Dist. 1982); *Francis v. Francis*, 2003-Ohio-1940, ¶ 21 (2d Dist.). However, we have also stressed that "a party's role as the primary caregiver is not given presumptive weight over other relevant factors." *Chelman v. Chelman*, 2008-Ohio-4634, ¶ 43 (2d Dist.). This is especially true since Ohio's legislature requires courts to consider the best interests of the child when determining all legal custody issues in abuse, neglect, and dependency cases. R.C. 2151.353; R.C. 3109.04(F)(1). While it appears from the juvenile court's decision that it did not explicitly consider Mother's status as P.W.'s "primary caregiver," we do not find this alone to be an abuse of discretion because the trial court addressed the statutory factors listed in R.C. 3109.04(F)(1). Additionally, while Mother was the primary caregiver, P.W. was adjudicated neglected and dependent. "A juvenile court adjudication of abuse, neglect, or dependency is a determination about the care and condition of a child and implicitly involves a determination of the unsuitability of the child's custodial . . . parents." *C.R.*, 2006-Ohio-1191, at paragraph two of the syllabus.

**{¶ 20}** In its decision, the juvenile court analyzed the facts from the hearing under each of the applicable statutory factors in R.C. 3109.04(F)(1) and concluded that legal custody to Father was in the best interests of P.W. Upon review, we determine that the juvenile court exercised a sound reasoning process and did not abuse its discretion.

**{¶ 21}** Regarding the wishes of P.W.'s parents, both Mother and Father are P.W.'s parents, and the juvenile court correctly noted in its decision that Mother wished to reunify with P.W. while Father wished for legal custody. As for the wishes and concerns of the child, at the time of the hearing in April 2025, P.W. was six years old. The juvenile court indicated in its decision that the GAL reported that P.W. was not mature enough to articulate her wishes and that it did not conduct an in-camera interview. Neither of the first two factors weighs in favor of Mother over Father.

**{¶ 22}** Regarding P.W.'s interaction and interrelationship with her parents, siblings, and any other person who may significantly affect her, the trial court heard evidence from Maternal Grandmother that P.W. indicated a desire to be with Mother. Mother had cared for P.W. since her birth in April 2019 until Mother's arrest in January 2024. However, the juvenile court noted that between January 2024 and the hearing in April 2025, P.W. had been in the care of Maternal Grandmother, and that due to Mother's criminal cases and court-ordered residential drug treatment, Mother had not had physical contact with P.W. between November 2024 and April 2025, although she had maintained regular telephone and FaceTime contact. While not specifically noted by the juvenile court, it can be inferred that P.W. was bonded with Mother. The juvenile court also heard evidence that P.W. was bonded with Maternal Grandmother.

**{¶ 23}** However, evidence also demonstrated that Father was bonded with P.W. In addition, Father's wife of six years also lived in his home, and evidence showed P.W. was

9

bonded with her. P.W. called Father "Daddy", was excited to see Father for visits, and ran to Father's truck during visits. P.W. expressed sadness when Father took her back to Maternal Grandmother's home at the end of visits.

{¶ 24} While P.W. has four other siblings, there was no evidence presented to the juvenile court regarding P.W.'s relationship or interactions with them. However, the juvenile court noted in its decision that the twins were in foster care, one of P.W.'s older siblings was residing with his or her biological father, and the other older sibling was residing with his or her paternal grandfather. The third factor also does not weigh in favor of Mother over Father.

{¶ 25} With respect to P.W.'s adjustment to her home, school, and community, the juvenile court heard evidence that P.W. struggled with adjusting to changes in her life. If a schedule changed, P.W. would act out by screaming and crying. Though Maternal Grandmother said that P.W. acted out when Father visited, Maternal Grandmother admitted the acting out was limited to the start of visits with Father. It was not an ongoing issue.

{¶ 26} Father testified that his home is a two-bedroom house and P.W. has her own room with a bed, stuffed animals, toys. He explained that he and his wife maintain a schedule with P.W. When P.W. was with them, she did not act out but instead was a happy child. P.W. allowed Father to play with her and gave her kisses. When P.W. was with Father's wife, P.W. was also affectionate by giving her frequent hugs and kisses. P.W. was either in preschool or kindergarten, but there was no evidence presented as to P.W.'s adjustment to her school. Father testified that he was committed to keeping P.W. in the same school so P.W. did not have to make an adjustment.

{¶ 27} Father also testified that he and his wife were integrating P.W. into his community by taking P.W. out. With Father, P.W. had enjoyed a local park, a trampoline park for her sixth birthday party celebration, and Easter egg hunting for P.W.'s first Easter

holiday with Father. The fourth best-interest factor weighs more heavily in favor of Father over Mother as there is sufficient, credible evidence that P.W. was adjusting positively to Father, his wife, and the community in which they resided.

{¶ 28} In relation to the mental and physical health of all people involved, testimony from Mother's caseworker indicated Mother was easily overwhelmed and had quit a job after one day due to stress. In comparison, Father was gainfully employed, stable, and presented with no mental health concern. Evidence also indicated that despite Mother's completion of an in-patient drug treatment program, she had a history of substance abuse and failed to follow through with a recommendation to reside in a sober living home after her in-patient treatment. Father did not have substance abuse issues. Regarding the mental and physical health of the parties, this factor weighs in favor of Father over Mother.

{¶ 29} Considering the parent more likely to honor and facilitate court-approved parenting time rights or visitation, the juvenile court noted Father's testimony that he would ensure P.W. maintained her relationships with Maternal Grandmother, siblings, and Mother. In comparison, the juvenile court noted that Maternal Grandmother demonstrated some reluctance in facilitating visitations with Father. This factor weighs more heavily in favor of Father over Mother as well.

{¶ 30} As the remaining factors in R.C. 3109.04(F)(1)(g) through (j) do not apply, we need not discuss them, as the juvenile court also found them to be inapplicable. To the extent that Mother also argues that she was compliant with her case plan and made good faith efforts to reunite with P.W., we have repeatedly held that while case plan compliance is relevant to the child's best interests, it is not dispositive. *Z.C.*, 2023-Ohio-963, at ¶ 38 (2d Dist.); *In re C.W.*, 2020-Ohio-6849, ¶ 19 (2d Dist.); *In re J.M.*, 2020-Ohio-822, ¶ 15 (2d Dist.). "This is so because the best-interest factors encompass much more than the

11

parent's case-plan objectives, and they do so from the perspective of the child's particular needs. In short, the focus of a best-interest analysis is on the child, not the parent." *In re A.K.*, 2017-Ohio-8100, ¶ 11 (2d Dist.).

**{¶ 31}** Based on its review of the record, the juvenile court found, by a preponderance of the evidence, that the statutory best-interest factors supported awarding legal custody of P.W. to Father. The trial court engaged in a thorough analysis and reached a conclusion that was entirely reasonable. Having reviewed the relevant factors under R.C. 3109.04(F)(1), we cannot say that the trial court abused its discretion in granting legal custody of P.W. to Father. Mother's assignment of error is overruled.

**V. Conclusion**

**{¶ 32}** Having overruled Mother's assignment of error, the judgment of the juvenile court is affirmed.

. . . . . . . . . . . . .

EPLEY, J., and HUFFMAN, J., concur.