[Cite as *In re T.F.*, 2021-Ohio-4104.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | |
|---|---|
| IN RE: T.F., T.F., D.W., D.W. | : |
| | : |
| | :     Appellate Case No. 29139 |
| | : |
| | :     Trial Court Case Nos. G-2016-4550- |
| | :     0Q-0S, G-2016-4551-0R, 0T, G-2016- |
| | :     4553-0T, 0V, G-2017-5100-0R, 0T |
| | : |
| | :     (Appeal from Common Pleas Court- |
| | :     Juvenile Division) |

. . . . . . . . . . .

O P I N I O N

Rendered on the 19th day of November, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LISA M. LIGHT, Atty. Reg. No. 0097348, Assistant
Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division,
Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Appellee, Montgomery County Children Services

P.J. CONBOY, II, Atty. Reg. No. 0070073, 5613 Brandt Pike, Huber Heights, Ohio 45424
    Attorney for Appellant, Mother

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Mother appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which granted legal custody of her daughters, T.F.1, D.W.1, and D.W.2, to Mother's maternal aunt, and legal custody of her son, T.F.2, to Mother's maternal cousin. For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} Mother has two children with T.F., a daughter, T.F.1, born in 2011, and a son, T.F.2, born in 2012. Mother also has two daughters with D.W., D.W.1, born in 2015, and D.W.2, born in 2017.

{¶ 3} On July 20, 2016, the Montgomery County Department of Job and Family Services, Children Services Division ("MCCS"), filed a dependency complaint concerning T.F.1, T.F.2, and D.W.1. MCCS alleged in the complaint that Mother was mentally unstable and was allowing the children to be exposed to domestic violence between herself and D.W. On October 6, 2016, the trial court adjudicated T.F.1, T.F.2, and D.W.1 dependent and granted custody of the children to Mother with MCCS maintaining protective supervision.

{¶ 4} On August 22, 2017, MCCS filed an abuse, neglect, and dependency complaint concerning D.W.2., who was born five months earlier. MCCS alleged in the complaint that Mother had a domestic dispute with D.W. on June 18, 2017, during which D.W. physically assaulted Mother while her children were present. MCCS alleged that, as a result of the assault, Mother was hospitalized with a concussion and required stitches

on her face. MCCS also alleged in the complaint that on June 23, 2017, Mother left three-month-old D.W.2 and her siblings, T.F.1, T.F.2, and D.W.1, unsupervised in a parked vehicle while Mother went to attend a medical appointment for her injuries.

{¶ 5} In addition to its complaint, on August 22, 2017, MCCS filed a motion for the trial court to grant temporary custody of Mother's daughters, T.F.1, D.W.1, and D.W.2, to D.W.'s sister, P.K., and temporary custody of Mother's son, T.F.2, to a non-relative, A.W. In the alternative, MCCS moved the trial court to grant temporary custody of all the children to MCCS. Following an interim order hearing, on September 14, 2017, the trial court granted P.K. interim temporary custody of T.F.1, D.W.1, and D.W.2, and A.W. interim temporary custody of T.F.2.

{¶ 6} On November 3, 2017, the trial court adjudicated D.W.2 abused, neglected, and dependent. Also on November 3, 2017, the trial court granted temporary custody of T.F.1, D.W.1, and D.W.2 to MCCS, as the trial court found that P.K. was not expected to pass MCCS's home study. The trial court also granted temporary custody of T.F.2 to A.W.

{¶ 7} Eight months later, on July 17 and 30, 2018, MCCS filed motions for temporary custody of T.F.2 to be transferred to MCCS on grounds that A.W. was no longer willing and able to care for T.F.2. On July 17, 2018, MCCS also moved for a first extension of temporary custody for all four children. The trial court granted MCCS interim temporary custody of T.F.2 on July 30, 2018. On August 6, 2018, MCCS amended its motion for a first extension of temporary custody to also request that temporary custody of T.F.1, D.W.1, and D.W.2 be transferred to Mother's maternal aunt, M.H., and that temporary custody of T.F.2 be transferred to Mother's maternal cousin,

E.D.

{¶ 8} On September 13, 2018, the trial court issued an order extending temporary custody of T.F.1, D.W.1, and D.W.2 to M.H., and extending temporary custody of T.F.2 to E.D. On March 20, 2019, the trial court once again extended temporary custody of the children to M.H. and E.D. On June 25, 2019, MCCS filed a motion for the trial court to grant M.H. legal custody of T.F.1, D.W.1, and D.W.2, and a motion for the trial court to grant E.D. legal custody of T.W.2. On June 28, 2019, Mother filed a motion for visitation regarding all four children. On July 16, 2019, Mother also filed a motion requesting that the trial court extend the temporary custody granted to M.H. and E.D., or alternatively, to grant Mother legal custody of all four children. The trial court held dispositional hearings on these motions on October 4, 2019, and February 10, 2020.

{¶ 9} During the October 4, 2019 hearing, MCCS presented testimony from MCCS Child Welfare Supervisor Monica Burton and MCCS caseworker Shanta Anderson. During the February 10, 2020 hearing, MCCS presented additional testimony from Anderson as well as testimony from licensed psychologist Dr. Rhonda Lilley. Mother also testified at the February 10, 2020 hearing and presented testimony from her parenting coach, Jill Meitzner, and from Tarin Macher of Empowered Excellence Behavioral Health. The children's guardian ad litem ("GAL") also provided his custody recommendation at the February 10, 2020 hearing. The following is a summary of the testimony presented at the dispositional hearings.

*Monica Burton*

{¶ 10} Burton testified that she was a Child Welfare Supervisor with MCCS who

had been involved with Mother since 2015. Burton testified that she initially became involved with Mother due to concerns about Mother's mental health and due to a domestic violence incident between Mother and D.W. Burton testified that MCCS became involved with Mother again in June 2017, after D.W. was arrested for assaulting Mother by breaking her nose in front of the children. Burton testified that two weeks after that incident, Mother left T.F.1, T.F.2, D.W.1, and D.W.2 in her vehicle for 45 minutes while Mother attended a doctor's appointment.

{¶ 11} Burton also testified regarding Mother's criminal history, which included several theft offenses. Burton testified that in 2018, Mother and several of her friends were caught shoplifting at Marshalls. More recently, Burton testified that Mother had been arrested in July 2019 for failure to comply with the order or signal of a police officer; Burton indicated that the offense stemmed from Mother's failing to pull over for a traffic stop and engaging in a police pursuit while one of her children was in the vehicle with her. Burton testified that Mother had recently been convicted for the failure to comply offense, noting that it was a third-degree felony.

{¶ 12} Burton testified that MCCS had ongoing concerns about Mother's friendships because Mother had consistently made choices to bring people into her life who engaged in criminal behavior. Burton also testified that Mother exposed her children to individuals with substance abuse issues. For example, Burton testified that the alleged father of Mother's youngest son, who was not part of this case, had been on probation for possession of drugs and recently passed away from a drug overdose on September 21, 2019. Burton testified that it was reported that Mother had spent a lot of time with this individual in her bedroom while the children were in Mother's care.

**{¶ 13}** Burton also testified that MCCS had concerns about Mother's continuing to interact with D.W. despite D.W.'s attacking her in the past. Burton testified that during her home visit with Mother, Mother did not deny having conversations with D.W. after he was incarcerated for assaulting her. Burton testified that Mother and D.W. had exchanged gifts and that Mother talked to D.W. on the phone. Burton also testified that during a period of time that D.W. had been released from jail in 2018, Mother allowed her children to visit D.W. and D.W.'s family. Burton testified that in June 2018, T.F.1 told Burton that she was afraid of D.W. because D.W. picked T.F.1 up by the shoulders and made threats to her.

**{¶ 14}** Burton additionally testified that Mother had not completed all of her case plan objectives with MCCS. Specifically, Burton testified that Mother had not demonstrated stability in employment and had not followed all of the recommendations from her parenting and psychological evaluations, which included having no contact with her abusers. Burton testified that although Mother had completed the domestic violence program at Artemis several times, Mother had not demonstrated that she had gained any knowledge from the program. Burton also testified that Mother was not stable given that she had recently been convicted of a felony offense. Burton further testified that Mother did not make choices that provided for the safety of her children and that MCCS believed Mother's visitation with the children should be, at the very least, monitored.

**{¶ 15}** Burton testified that she had had no contact with D.W. due to D.W.'s being incarcerated during most of the case. Burton testified that she had had conversations with T.F. as recently as July 2019, during which T.F. advised her that he was not working and was not in a position to care for T.F.1 and T.F.2. Burton, however, testified that T.F.

had expressed interest in visiting T.F.1 and T.F.2.

*Shanta Anderson*

{¶ 16} Anderson testified that she was the MCCS caseworker who had been assigned to Mother's case for the past two years. Anderson testified that she became involved with Mother because Mother left T.F.1, T.F.2, D.W.1, and D.W.2 unattended in a parked vehicle for an extended period of time. Anderson testified that in the summer of 2018, the children were placed with relative caregivers; T.F.1, D.W.1, and D.W.2 were placed with Mother's maternal aunt, M.H., while T.F.2 was placed with Mother's maternal cousin, E.D. Anderson testified that M.H. and E.D. had lived together in the same home with all the children for a time, but had recently moved apart. Anderson testified that home studies had been conducted on both M.H. and E.D.'s homes, and that both homes had been approved by MCCS. Anderson testified that all of the children were doing well in their current placements, and that M.H. and E.D. were meeting all of the children's basic needs.

T.F.1:

{¶ 17} Anderson testified that T.F.1 had observed domestic violence between Mother and D.W. and in Mother's past relationships as well. Anderson testified that in the summer of 2018, before T.F.1 was placed in relative care, T.F.1 disclosed to her foster family that D.W. had held her and T.F.2's heads under water. Anderson testified that she spoke with T.F.1 about the incident and T.F.1 told her that the incident happened while she and her siblings were still in Mother's care. During the summer of 2018, T.F.1 also advised Anderson that she was afraid of D.W. because she had observed him

harming Mother. Anderson testified that, more recently, T.F.1 advised that she was upset with Mother because, during a visitation at Mother's home, Mother spent a majority of the time in her bedroom with her boyfriend instead of spending time with T.F.1 and her siblings.

{¶ 18} Anderson testified that T.F.1 did not have special needs but went to counseling for anger and separation issues. Anderson testified that T.F.1 had previously received counseling at Samaritan Behavioral Health and received counseling at school at the time of the hearing. Anderson testified that Samaritan Behavioral Health identified Mother and T.F.1's placement in relative care as the source of T.F.1's anger issues. Anderson testified that T.F.1 had no mental health diagnosis and was not on an Individualized Educational Plan ("IEP") at school. Anderson testified that T.F.1 did pretty well in school, but sometimes bullied other children. Anderson testified that T.F.1 was otherwise popular at school and talked to everyone. Anderson testified that since being placed in relative care, T.F.1 had become more stable with her schooling.

T.F.2:

{¶ 19} Anderson testified that in the summer of 2018, T.F.2 disclosed to her that he had observed his father, T.F., assault Mother by hitting her in the face. Anderson testified that T.F.2 had also disclosed that he had observed Mother being abused by D.W. Anderson testified that T.F.2 had counseling needs due to anger and temperament issues. Anderson testified that T.F.2 had previously been engaged with Samaritan Behavioral Health for counseling and was engaged in counseling at school at the time of the hearing. Anderson testified that T.F.2 had been diagnosed with Oppositional Defiant Disorder ("ODD") and had been prescribed no medications. Anderson testified that since

being placed in relative care, T.F.2 was doing better in school and was no longer on an IEP. Anderson testified that T.F.2 had previously been on an IEP for reading and behavioral issues.

D.W.1:

{¶ 20} Anderson testified that D.W.1 had no special needs and was developmentally on track. Anderson testified that MCCS was waiting for D.W.1 to be accepted into the Head Start program at Miami Valley Child Development Center, as there was a waiting list for D.W.1's age group. Anderson testified that M.H. had tried to enroll D.W.1 into a local preschool, but M.H. could not afford the monthly tuition.

{¶ 21} Anderson testified that D.W.1 had previously engaged in counseling for tantrums, not listening, and erratic behaviors. Anderson testified that D.W.1 had not made any disclosures since she was still very young. According to Anderson, there were no issues or concerns at the time of the hearing that need to be addressed with regard to D.W.1. Anderson testified that D.W.1 had become much calmer six months after she was placed with M.H.

D.W.2:

{¶ 22} At the October 4, 2019 dispositional hearing, Anderson testified that D.W.2 had a slight speech delay and was very small in stature. Anderson also testified that M.H. regularly took D.W.2 to the speech and developmental pediatrics departments at Kinship Care in order to address D.W.2's speech and growth issues. Anderson testified that D.W.2's treatment providers recommended that D.W.2 continue with speech therapy and follow all recommendations with the developmental pediatrics program. At the February 10, 2020 hearing, Anderson testified that D.W.2 had recently graduated from a

speech program at Dayton Children's Hospital, and that D.W.2 was then on track with regards to her speech and growth.

Mother's Case Plan and MCCS's Concerns:

**{¶ 23}** Anderson testified that MCCS had a case plan in effect for Mother and that she last spoke with Mother regarding her case plan on January 15, 2020. Anderson testified that Mother was aware of her case plan objectives and that she and Mother had reviewed her progress on the case plan. Anderson testified that Mother's case plan objectives were as follows:

- Complete a mental health assessment and follow all recommendations from the assessment;

- Complete a parenting and psychological evaluation and follow all recommendations from the evaluation;

- Visit with the children on a regular basis and adhere to supervised and unsupervised visits by MCCS;

- Obtain and maintain sufficient income to support herself and her children;

- Obtain and maintain safe and appropriate housing;

- Complete domestic violence education/counseling at Artemis and follow all recommendations, including making and implementing a safety plan;

- Refrain from making choices that place the children at risk of harm;

- Attend parenting classes; and

- Sign all releases of information.

**{¶ 24}** Anderson testified that Mother completed a mental health assessment with Empowered for Excellence Behavioral Health, which diagnosed Mother with post-

traumatic stress disorder ("PTSD"). However, Anderson testified that Mother's counseling with Empowered for Excellence focused on parenting skills and separation as opposed to Mother's mental health needs. Anderson testified that MCCS had ongoing concerns with Mother's mental health because of Mother's criminal behavior and involvement with domestic violence.

{¶ 25} Anderson also testified that Mother completed a parenting and psychological evaluation with Dr. Rhonda Lilley. Anderson testified that Dr. Lilley recommended Mother engage a parenting mentor to assist Mother with effectively interacting with her children. Anderson testified that sometime after Mother's evaluation with Dr. Lilly, Mother began having sessions with a parenting mentor through MCCS. Although Mother completed the required parenting and psychological evaluation and participated in parent mentoring as recommended, Anderson testified that the parenting and psychological objective was ongoing because Anderson had yet to receive a report indicating whether Mother had demonstrated any learned skills from the parenting mentor.

{¶ 26} With regard to visitation, Anderson testified that Mother visited the children once a week through MCCS and also had visitation outside of MCCS as agreed by the relative caregivers. Anderson testified that Mother did not visit her children regularly outside of MCCS, but testified that M.H. and E.D. were willing to work with Mother on visitation and were in daily contact with Mother. Anderson also testified that Mother had daily contact with her children via text messages and phone calls.

{¶ 27} With regard to income, Anderson testified that Mother moved from job to job and had not demonstrated stability with maintaining the same employer. Anderson

also testified that Mother's employment was sporadic and that she went months without working. At the February 10, 2020 hearing, Anderson testified that the last time Mother had verified her income and employment was five months earlier when she had been working as a factory worker at MAHLE. Anderson testified that Mother had provided verification of full-time employment at MAHLE for approximately two months in 2019. Anderson testified that Mother also previously had worked part-time at McDonald's in Moraine for three months while she was pregnant with her youngest child, who was not involved in this case.

{¶ 28} Anderson testified that Mother had recently advised Anderson's supervisor that Mother was working at McDonald's in Englewood but had provided no verification of that employment. Anderson also testified that Mother's attorney advised her that Mother had recently worked a seasonal position at Kohl's for approximately two months, but had provided no verification of that employment either. Anderson further testified that, most recently, Mother advised her at court that Mother was working at First Call and also cleaning houses on the side. However, Anderson once again testified that Mother had provided no verification of that employment. Anderson testified that Mother's income objective was incomplete.

{¶ 29} Anderson testified that MCCS had referred Mother to Artemis for domestic violence education and that Mother had completed the Artemis program at least three times. Anderson, however, testified that Mother had not demonstrated the skills that were taught during the Artemis courses.

{¶ 30} Anderson testified that Mother had completed the housing, release of information, and parenting class objectives. Anderson, however, testified that Mother

was not with the children long enough for Mother to show the skills that were taught in the parenting classes.  Anderson testified that during visits at MCCS, Mother could not control the children in a small setting.

{¶ 31} Anderson testified that MCCS was concerned about who was in the home with Mother during her in-home visits with the children.  Anderson testified that Mother had been involved with inappropriate paramours throughout the case.  Anderson testified that Mother's ex-boyfriend and alleged father of her youngest child was a known drug user who had recently passed away from a drug overdose.  Anderson also testified that T.F.1 disclosed to her that during a visit at Mother's home, Mother had been upstairs in her bedroom with T.F. "doing the nasty."  Trans. Vol. I (Oct. 4, 2019), p. 70.  Anderson testified that the relative caregivers reported that immediately after T.F.1 and T.F.2 visited with Mother they display sexualized acts, such as "humping" on each other.  *Id.*

{¶ 32} Anderson testified that MCCS's biggest concern with Mother's ability to supervise and parent her children was the people with whom Mother chose to surround herself and her children.  Anderson testified that MCCS had done background checks on everyone and that the background checks indicated that Mother exposed her children to individuals with criminal histories and histories with MCCS.  Anderson testified that if Mother regained custody of her children, MCCS would also be concerned about Mother's ability to maintain the children's safety.  Accordingly, Anderson testified that Mother's visits with her children should be monitored.

{¶ 33} Anderson testified that if M.H. and E.D. got legal custody of the children, Mother could visit the children so long as M.H. and E.D. agreed to the visit and found that the proposed visit was safe and appropriate for the children.  Anderson testified that

granting legal custody to M.H. and E.D. was in the best interest of the children because the children's behaviors had improved since being placed with them. Anderson also testified that the children had stability, were doing well in school, and were thriving with M.H. and E.D. Anderson further testified that the children were able to see each other on a regular basis in their current placements with M.H. and E.D.

Fathers T.F. and D.W.:

{¶ 34} Anderson testified that she last spoke with T.F. on the phone in July 2020, and that T.F. had told her that he was going to contact her to set up a time to meet and discuss his case plan. Anderson, however, testified that T.F. never had contacted her and had not been cooperative throughout the entire case. Anderson also testified that T.F. did not see T.F.1 and T.F.2 regularly. Anderson noted during the October 4, 2019 hearing that T.F.'s last visit with the children had been months ago and that he had stopped making attempts to visit the children. Anderson testified that T.F. had no housing or income for the children and that any visitation by T.F. should be supervised if legal custody were granted to M.H. and E.D.

{¶ 35} Anderson testified that she has had no contact with D.W. given that D.W. had been incarcerated for assaulting Mother. Anderson testified that D.W.'s expected release date was February 2022. Anderson testified that D.W. had no contact with the children and that any visitation with D.W. would have to be supervised given his known history of violence.

*Dr. Rhonda Lilley*

{¶ 36} Dr. Lilley testified that she was a psychologist who performed a

psychological evaluation on Mother in April 2019 at the request of MCCS. Dr. Lilley testified that she performed an MMPI personality inventory on Mother, which is used to diagnose mental health issues and personality disorders. Dr. Lilley testified that the MMPI can give an overall understanding of an individual's mental health functioning.

{¶ 37} Dr. Lilley testified that Mother's MMPI results showed that Mother was somewhat defensive and insecure with feelings of inadequacy and low self-esteem. Dr. Lilley explained that Mother's test results also showed that Mother could be impulsive at times and could be somewhat reactive to rules, restrictions, and regulations. Dr. Lilley testified that the MMPI results further showed that Mother tended to have poor problem-solving skills and tended to have difficulty benefitting from past experiences. Dr. Lilley testified that the MMPI results were concerning due to Mother's history of being involved in relationships with domestic violence.

{¶ 38} Dr. Lilley testified that she also performed a parenting stress inventory on Mother, which looked at characteristics of the parent, child, and the environment that could create stressors in parenting. Dr. Lilley testified that she observed Mother's parent-child interaction and observed that Mother had a very positive relationship with her children. Dr. Lilley testified that the children were excited to see Mother and enjoyed spending time with her. Dr. Lilley testified that Mother was very nurturing with the children and that Mother did a good job of dividing her time between the children. Dr. Lilley testified that Mother cared about the children's well-being and that there appeared to be a strong bond between them. Dr. Lilley testified that the only problem she observed was Mother's having difficulty structuring all the activities for the children and difficulty following through with the limits that Mother set for the children's behavior.

{¶ 39} Dr. Lilley testified that based on Mother's dependency features, personality profile, and history of being involved in abusive relationships, her biggest concern with Mother's having legal custody of the children would be that Mother was at a high risk for reengaging in abusive relationships without insight and awareness. Dr. Lilley testified that because of Mother's history of continuing contact with individuals who had abused her, there was a significant concern that Mother was easily coerced and could gradually reengage in a relationship with her abuser. Dr. Lilley testified that Mother's dependent personality features affected her ability to parent and made her more vulnerable to reengaging in the abusive relationships.

{¶ 40} Dr. Lilley testified that Mother's reengaging in abusive relationships created a safety risk for children and did not provide the kind of modeling that children should have. Dr. Lilley testified that reengaging in abuse relationships could teach children that being in a violent relationship is okay and that it is okay to be abused. Dr. Lilley testified that it could also put the children in the role of wanting to protect the parent being abused, which could result in the children getting hurt. Dr. Lilley testified that it could also contribute to the children not doing well in school and to developing PTSD, depression, or anxiety due to what they witnessed.

{¶ 41} Dr. Lilley testified that she had concerns about Mother's ability to make good decisions, which could create an unstable, chaotic environment for children. Dr. Lilley testified that she questioned Mother's ability to make good decisions because Mother went upstairs with a male during a visit with the children and because Mother violated a MCCS restriction by inviting D.W.'s family to a visit with the children. Dr. Lilley testified that she was also concerned about Mother's judgment due to her criminal history.

{¶ 42} Dr. Lilley testified that Mother had previously been diagnosed with adjustment disorder with disturbance of mood and behavior, PTSD, and depressive disorder. Dr. Lilley testified that based on her assessment, in order to reunify Mother with her children, Mother should have a stable job and income, stable housing, and no contact with her abusers. Dr. Lilley also suggested that Mother have longer visits with her children and engage a parenting mentor to support Mother during the visits. Dr. Lilley testified that she would recommend the parenting mentor to have in-home visits with Mother and to make unannounced visits to see how well Mother was doing when not prepared for a visit.

{¶ 43} Dr. Lilley testified that only Mother should be in the home during Mother's in-home visits with the children, and that Mother's entire focus should be on the children. Dr. Lilley testified that she strongly recommended that there be no male paramours around during the visits because it was important for the children to see that Mother was focused on them. Dr. Lilley recommended that there be no distractions that might cause Mother to engage in sexualized behavior while the children were present.

*Tarin Macher*

{¶ 44} Macher was employed at Empowered for Excellence Behavioral Health, where Mother had been a client for two years. Macher testified that she had taught Mother individualized parenting courses once a week for ten weeks. Macher testified that during the parenting courses, she and Mother had discussed the developmental stages of children, behavioral management skills, appropriate rewards and punishments, and general parenting skills. Macher testified that Mother's attendance at class had

been pretty good and that Mother had had no compliance issues. Macher, however, testified that she was unaware as to why Mother's children had been removed from her custody and indicated that she could not speak as to whether she had any concerns with Mother having unsupervised visits with the children.

{¶ 45} Macher also testified that Mother had completed mental health and substance abuse assessments through the Empowered for Excellence program. Macher testified that a therapist had provided Mother with individual therapy sessions during which they had worked on coping skills to address Mother's mental health diagnosis that was revealed through the assessment. Macher testified that she had not been the person who performed the mental health assessment and indicated that she was unaware of Mother's mental health diagnosis. Macher did, however, testify that Empowered for Excellence performed random urinalysis screenings and that Mother had not had any screens that tested positive for substance use. Macher also testified that Mother had had a positive demeanor and successfully completed the entire Empowered for Excellence program.

*Mother*

{¶ 46} Mother testified that she was 26 years old with six biological children. Mother testified that none of her children were currently in her custody. Mother testified that in July 2019, she agreed to have her youngest child, who was not part of this case, placed in the legal custody of E.D., and she noted that E.D. was taking good care of the child. Mother testified that her oldest child, who also was not part of this case, was in the custody of the child's paternal aunt.

{¶ 47} Mother testified that she lived by herself in a three-bedroom home where she claimed there was adequate space for all of her children. Mother testified that she paid $376 a month in rent, $14 a month for Vectren and DP&L, and $100 to $150 every three months for her water bill.

{¶ 48} Mother testified that she worked at a staffing agency known as First Call at the time of the hearing, where she worked 40 hours a week and was paid $11 per hour. Mother testified that as of the February 10, 2020 hearing, she had worked at First Call for only one week. Mother also testified that she cleaned houses and buildings through a contractor and was paid $11.25 per hour "under the table." Trans. Vol. II (Feb. 10, 2020), p. 252. Mother testified that the hours she worked cleaning houses and buildings varied from week to week. Mother testified that from September 2019 to December 2019, she worked 40 hours a week at Kohl's making $13.68 per hour, and she noted that her hourly rate doubled on the weekends. Mother claimed that she had enough income to support her children if they were returned to her custody.

{¶ 49} With regard to her mental health, Mother testified that she had been hospitalized at Kettering Behavioral Health in March 2016, because of depression, anxiety, and lack of sleep. Mother also testified that she had completed mental health treatment through South Community, Eastway, and Empowered for Excellence. Mother testified that Empowered for Excellence diagnosed her with PTSD. Mother testified that she regularly went to counseling at Empowered for Excellence, during which she discussed her children and coping mechanisms for PTSD. Mother testified that she had completed the Empowered for Excellence program in September 2019. Mother testified that she was not currently in need of or receiving mental health treatment.

{¶ 50} Mother testified that while her children were in her care, she had been charged and later convicted with failure to comply with the order or signal of a police officer, a third-degree felony. Mother testified that she was on probation and underwent urinalysis screenings. Mother testified that during one of her urinalysis screenings, it was discovered that she was in possession of mace on her keychain. Mother testified that she left the urinalysis screening with the mace in her possession even after she was told that having mace was a violation of her probation. Mother testified that a warrant was subsequently issued for her arrest after she failed to get in touch with her probation officer regarding the matter. Mother testified that she spent five days in jail as a result of the incident. Mother admitted that keeping the mace in her possession had not been a good decision.

{¶ 51} Mother also testified to having multiple prior convictions for theft. Mother testified that when she was unemployed she would steal items such as toiletries, clothes, shoes, and items for her children. Mother testified that she no longer engaged in theft.

{¶ 52} With regard to domestic violence, Mother testified that she had completed the Artemis program three times and provided her certificate of completion to her MCCS caseworker. Mother testified that she completed the program three times because she became involved in a relationship with D.W. after he abused her. Mother testified that she had worked with Artemis in making and implementing a domestic violence safety plan.

{¶ 53} Mother testified that she was no longer in a relationship with D.W. Mother testified that as of the February 10, 2020 hearing, the last time she had had contact with D.W. was in November 2019. Mother testified that she did not talk to D.W. any longer

because it was not good for her case.

{¶ 54} Mother testified that for over a year she had been in a relationship with an individual who had recently died of a drug overdose. Mother claimed that she had been unaware of the individual's drug problem. Mother also denied ever having the individual or other adults over to her home while her children were visiting.

{¶ 55} Mother testified that she visited her children once a week for two hours through MCCS. Mother testified that she had reached out to M.H. and E.D. to get additional visits, but whether she could visit depended on M.H. and E.D.'s work schedules. Mother testified that she contacted M.H. and E.D. regularly to discuss her children. Mother testified that M.H. and E.D. sometimes answered the phone and/or returned her calls. Mother admitted that she had not asked M.H. and E.D. for a schedule of her children's extracurricular activities and doctor appointments. Mother testified that no one had prevented her from going to the children's extracurricular activities.

{¶ 56} Mother testified that she last saw her children at MCCS's visitation center a week prior to the February 10, 2020 hearing. Mother testified that her last visit with the children outside of MCCS had been in January 2020 for T.F.1's birthday celebration. Mother testified that she had only been able to see T.F.1 and T.F. 2 during that visit, and she admitted to taking the children to see T.F. Mother testified that she had last seen all of the children outside of MCCS at her house on December 26, 2019.

{¶ 57} Mother testified that the only concern she had with her children not being placed with her was that no one could take care of them the way she could. Mother testified that her relationship with her children was good and that they all shared a bond. Mother, however, admitted that she had some problems with T.F.1 talking back to her.

{¶ 58} Mother testified that she believed M.H. and E.D. took good care of her children and that the children were doing well in their placements. Mother, however, testified that she was afraid M.H. and E.D. would keep her children away from her. Later in her testimony, Mother admitted that M.H. and E.D. had not kept the children away from her while exercising temporary custody of the children.

{¶ 59} Mother testified that it was in the best interest of her children for her to have custody because she was their mother and she wanted them to be together in their regular home. Mother testified that she was a good mother and noted that she did not smoke or have pets. Mother testified that her children wanted to be at home with her and that they were never injured in her care as a result of her abusive relationships. Mother testified that she was no longer putting herself at risk and knew all the red flags when it came to domestic violence.

*Jill Meitzner*

{¶ 60} Meitzner testified that she was Mother's parenting mentor at MCCS. Meitzner testified that as of November 2019, she and Mother had met five times with the children at MCCS's visitation center to work on Mother's parenting skills. Meitzner testified that Mother wanted one-on-one interaction with Meitzner in order to help Mother make it less chaotic in the visiting room. Meitzner testified that she and Mother had established goals, such as Mother's brining food, showing up every week on time, establishing authority as the parent, and finding age-appropriate activities to do with the children.

{¶ 61} Meitzner testified that Mother could take criticism well and had a good

rapport with her children, but missed two of her scheduled visits. Meitzner also testified that during their first visit, Mother had yelled at T.F.1, had not had any food for the children, and had not interacted with the children. Meitzner, however, testified that Mother had remedied these issues during her subsequent visits and showed a lot of progression.

{¶ 62} Meitzner testified that during their subsequent visits, Mother brought food, games, and dolls for the children. Meitzner also testified that Mother had helped T.F.1 practice her cheerleading routines. Meitzner testified that Mother had been able to structure the visits appropriately and to control the routine and the dynamics to keep things upbeat and lighthearted. Meitzner also testified that Mother had engaged with her children, listened to her children, and had been generally interested in their extracurricular activities and schooling. Meitzner testified that when the children started discussing Mother and T.F.'s not getting a long, Mother did a good job of stopping the conversation.

{¶ 63} Meitzner testified that following her five visits with Mother, she wrote a report recommending that Mother's visits with her children be longer and moved off-site to Mother's home. Meitzner, however, recommended that the visits should continue to be monitored until Mother demonstrated that she was able to safely meet with her children away from MCCS. Once that occurred, Meitzner testified that the goal should be to gradually move toward Mother having unmonitored visits with the children.

{¶ 64} Meitzner testified that the children and Mother loved each other and enjoyed visiting each other. Meitzner testified that Mother showed affection to the children through hugs, kisses, and saying kind and positive things to them. Meitzner testified that the children were bonded to Mother and that she did not have any concerns about

Mother's parenting. Meitzner also testified that she would be willing to continue her role as a parenting mentor to Mother for at-home visits.

*The GAL*

**{¶ 65}** The children's GAL recommended to the trial court that legal custody of T.F.1, D.W.1, and D.W.2 be granted to M.H., and legal custody of T.F.2 be granted to E.D. The GAL also recommended that Mother's parenting mentor be permitted to do off-site visitation for a period of time, and, when deemed appropriate by the parenting mentor, Mother should be permitted to have a standard order of visitation with the children. The GAL further recommended that MCCS maintain protective supervision over the children for a period of six months so that MCCS could continue to provide services to the family. As to the fathers, the GAL recommended that T.F.'s parenting time should be as agreed by the custodians and that D.W. should have no parenting time.

*Trial Court's Decision*

**{¶ 66}** On February 21, 2020, the trial court magistrate granted legal custody of T.F.1, D.W.1, and D.W.2 to M.H. and legal custody of T.F.2 to E.D. The magistrate granted Mother parenting time with all four children as agreed by the parties. Concerning the fathers, the magistrate granted T.F. parenting time with T.F.1 and T.F.2 as agreed by the parties and ordered D.W. to have no contact with the children. The magistrate also granted MCCS protective supervision for six months in order to monitor and assist the family with establishing a visitation routine and to obtain additional information regarding Mother's ability to exercise off-site parenting time. The trial court magistrate further

ordered MCCS to continue to provide Mother a parenting mentor to monitor Mother's off-site parenting time.

{¶ 67} Mother thereafter filed objections and supplemental objections to the magistrate's decision. The trial court issued an order on April 22, 2020 overruling Mother's objections and adopting the magistrate's decision. Mother appeals, raising a single assignment of error for review.

**Assignment of Error**

{¶ 68} Under her sole assignment of error, Mother contends that the trial court abused its discretion by awarding legal custody of her children to M.H. and E.D. Mother argues that it was in the best interest of her children for Mother to obtain legal custody, or, alternatively, for the trial court to grant an extension of temporary custody to the relative caregivers.

{¶ 69} "An award of legal custody 'vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities.' " *In re J.C.*, 2d Dist. Montgomery No. 28847, 2020-Ohio-5540, ¶ 13, quoting R.C. 2151.011(B)(21). (Other citation omitted.) "Unlike an award of permanent custody * * *, '[a]n award of legal custody of a child does not divest parents of their residual parental rights, privileges, and responsibilities.' " *Id.*, quoting *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, paragraph one of the syllabus.

{¶ 70} "An appellate court will not reverse an award of legal custody absent an

abuse of discretion by the juvenile court." *Id.* at ¶ 16, citing *In re A.F.*, 2018-Ohio-310, 103 N.E.3d 1260, ¶ 54 (2d Dist.). " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." (Citation omitted.) *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "[T]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). Because "[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record[,] * * * the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct." (Citations omitted.) *Id.*

{¶ 71} "R.C. 2151.353(A)(3) provides that if a child is adjudicated a dependent child, the court may award legal custody of the child 'to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child[.]' " *J.C.* at ¶ 14, quoting R.C. 2151.353(A)(3). "A juvenile court may award legal custody of a child to an individual if the court finds, by a preponderance of the evidence, that legal custody is in the best interest of the child." *Id.*, citing *In re C.B.*, 2d Dist. Montgomery No. 28113, 2019-Ohio-890, ¶ 17. (Other citation omitted.) "Preponderance of the evidence simply means 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " *In re A.W.*, 2d Dist. Montgomery No. 21309, 2006-Ohio-2103, ¶ 6, quoting [*In re K.S.*], 2d Dist. Darke No. 1646, 2005-Ohio-1912, ¶ 15.

{¶ 72} When making a legal custody determination under R.C. 2151.353, the trial court "must do so in accordance with the 'best interest of the child' standard set forth in R.C. 3109.04(F)(1)." (Citations omitted.) *In re D.S.*, 2d Dist. Clark No. 2013-CA-51, 2014-Ohio-2444, ¶ 9; *J.C.,* 2d Dist. Montgomery No. 28847, 2020-Ohio-5540, at ¶ 15. R.C. 3109.04(F)(1) provides that when determining the child's best interest the trial court must consider all relevant factors, including, but not limited to the following:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers * * *, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been

adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; * * * and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

R.C. 3109.04(F)(1).

{¶ 73} In this case, the trial court considered the foregoing factors when making its best-interest determination. We note that the trial court determined that there was no testimony provided at the dispositional hearings relative to factors (g), (i), and (j), and therefore did not weigh those factors in its decision.

{¶ 74} With regard to factor (a)—the wishes of child's parents regarding the child's care—the trial court found that Mother believed it was in the children's best interest for her to have custody of them. The trial court noted that Mother stated that she wanted the children to be together with her in their regular home. The trial court also noted Mother's belief that the children wanted to be with her as well. The trial court found that T.F. advised MCCS that he was not in a position to care for T.F.1. and T.F.2, but was interested in visitation. The trial court found that the wishes of D.W., the father of D.W.1 and D.W.2, were unknown because D.W. has been incarcerated during the pendency of

the matter.

{¶ 75} Concerning factor (b)—the wishes and concerns of the child as expressed to the court—the trial court noted that it had conducted an in camera interview with T.F.1 and T.F.2 on October 4, 2019, and considered the contents of the interview when rendering its custody decision.  A transcript of the in camera interview with T.F.1 and T.F.2 was not made a part of the record on appeal.

{¶ 76} As to factor (c)—the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest—the trial court provided a detailed summary of the hearing testimony and discussed how Mother exposed her children to domestic violence, criminal activity, inappropriate friends and paramours, and how such exposure could negatively affect the well-being and safety of the children.  Additionally, the trial court discussed MCCS's concerns with Mother's ability to care for the children due mental health and other psychiatric issues for which Mother was hospitalized.  The trial court also discussed Mother's leaving the children alone in a vehicle for 45 minutes during the summertime when D.W.2 was only three months old.

{¶ 77} The trial court, however, also found that the children and Mother shared a bond and that Mother had a caring relationship with the children.  In addition, the trial court discussed how Mother had started to improve on her parenting skills since working with her parenting mentor.

{¶ 78} Concerning D.W., the trial court found that there was no testimony indicating that D.W. had any meaningful relationship with D.W.1 or D.W.2.   As to T.F., the trial court found that T.F. had been permitted to visit the children at MCCS, but had never exercised

visitation there. The trial court found that T.F. had only had unauthorized, off-site visits with the children.

{¶ 79} For factor (d)—the child's adjustment to the child's home, school and community—the trial court found that all of the children's needs were being met with M.H. and E.D. and noted that each child was doing well in his or her current placement. The trial court also discussed how the children had progressed since being placed with M.H. and E.D. For example, the trial court found that T.F.1 was doing well in school and that T.F.2 had improved in school and was no longer utilizing an IEP. The trial court also found that D.W.1 was calmer than she had been before her placement with M.H. and that D.W.2, who had speech and growth delays, had graduated from her speech therapy program at Dayton Children's Hospital. Although not mentioned by the trial court, the record indicates that D.W.2 was on track with regards to her speech and growth.

{¶ 80} With regard to factor (e)—the mental and physical health of all persons involved—the trial court noted that there was significant testimony surrounding Mother's mental health and her continued involvement with men who abused her. The trial court discussed Dr. Lilley's testimony about how Mother's personality profile showed traits of insecurity, low self-esteem, impulsivity, and behaving reactively to rules, restrictions, and regulations. The trial court also discussed Dr. Lilley's testimony concerning Mother's MMPI test results, which showed that Mother tended to have poor problem-solving skills and struggled with benefitting from past-experiences. The trial court further discussed Dr. Lilley's opinion that Mother was at an increased risk of reengaging in abusive relationships, because her assessment revealed dependent personality features that made her vulnerable to reengaging in relationships that could be coercive or potentially

violent. In addition, the trial court pointed to Dr. Lilley's testimony indicating that Mother had been diagnosed with adjustment disorder with disturbance of mood and behavior, PTSD, and depressive disorder.

{¶ 81} The trial court also discussed the mental health of each child. The trial court found that T.F.1 had no mental health diagnosis, but has issues with anger and frustration, which she addressed through counseling. The trial court noted that the source of T.F.1's anger was Mother and T.F.1's removal from Mother's home.

{¶ 82} The trial court found that T.F.2 had been diagnosed with ODD but had not been prescribed any medications. The trial court noted that T.F.2 received counseling to address his anger and temperament issues that stemmed from his exposure to domestic violence.

{¶ 83} The trial court found that D.W.1 did not have any special needs and was previously engaged in counseling to address tantrums, not listening, and overall erratic behavior. The trial court found that D.W.2 received speech and developmental therapy. The trial court found that there was no testimony provided about the mental health of the children's fathers.

{¶ 84} When considering factor (f)—the parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights—the trial court found that Mother had scheduled visits with her children at MCCS and also had visits outside of MCCS when agreed upon by Mother and the relative caregivers. The trial court discussed Mother's testimony indicating that she did not regularly receive visitation outside of MCCS because of M.H. and E.D.'s schedules.

{¶ 85} Factor (h) allows the trial court to consider "whether there is reason to

believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child." R.C. 3109.04(F)(1)(h). When considering this factor, the trial court found that D.W.2 had been adjudicated abused under R.C. 2151.031(B) and neglected under R.C. 2151.03(A)(2) per the magistrate's order of November 3, 2017. Based on that order, the trial court found that Mother and D.W. had both been perpetrators of the abusive and neglectful acts that were the basis of the adjudication. With regard to D.W., it was found that D.W.2 had been endangered due to domestic violence perpetrated by D.W. against Mother inside of a vehicle while D.W.2 was present. *See* Magistrate's Decision and Judge's Order (Nov. 3, 2017), p. 3. With regard to Mother, it was found that D.W.2 lacked adequate parental care because Mother had left D.W.2 in her vehicle unsupervised while Mother attended a doctor's appointment. *Id.*

{¶ 86} Based on the foregoing findings, the trial court found by a preponderance of the evidence that the aforementioned best-interest factors supported awarding legal custody of T.F.1, D.W.1, and D.W.2 to M.H. and legal custody of T.F.2 to E.D. We see no abuse of discretion in this determination, as the trial court engaged in a thorough analysis and the record indicates that the trial court's conclusion was reasonable.

{¶ 87} Mother nevertheless argues that the trial court's decision granting legal custody to M.H. and E.D. was an abuse of discretion because the trial court disregarded the progress Mother made on her case plan. The record, however, establishes that the trial court carefully considered Mother's case plan and went into great detail about discussing Mother's progress on each of her case plan objectives. *See* Judge's Final Appealable Order (Apr. 22, 2021), p. 12-18. Regardless, it is well established that compliance with a case plan is not dispositive of the trial court's best-interest

determination. *In the Matter of T.S.*, 2017-Ohio-482, 85 N.E.3d 225, ¶ 12 (2d Dist.), citing *In re T.D.*, 2d Dist. Montgomery No. 27136, 2016-Ohio-7245, ¶ 12. This court has explained that:

> " '[A] parent's case plan compliance, while it may be relevant to a best interest analysis, does not automatically override a trial court's decision regarding what is in a child's best interests.' " [*In re T.D.* at ¶ 12], quoting *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 59, citing *In re N.L.*, 9th Dist. Summit No. 27784, 2015-Ohio-4165, ¶ 35. This court has recognized that "[w]hen the focus is on the child's best interest, a trial court conceivably could terminate parental rights even if a parent completed all of her case-plan objectives." *In re T.D.* at ¶ 12, citing *In re M.B.* This court also has observed that "[t]he case plan is simply 'a means to a goal, but not the goal itself,' * * *." *Id.*, quoting *In re J.H.*, 12th Dist. Clinton Nos. CA2015-07-014, [CA2015-07-015], 2016-Ohio-640, ¶ 47 (citations omitted); *see also In re R.P.*, 2d Dist. Montgomery Nos. 26744, 2015-Ohio-4295, ¶ 17[.]

*T.S.* at ¶ 12.

**{¶ 88}** Because the trial court appropriately evaluated the evidence and best-interest factors set forth in R.C. 3109.04(F)(1), we find no abuse of discretion in the trial court's determination that legal custody in favor of M.H. and E.D. was in the children's best interest by a preponderance of the evidence.

**{¶ 89}** Mother's sole assignment of error is overruled.

**Conclusion**

**{¶ 90}** Having overruled Mother's assignment of error, the trial court's judgment awarding legal custody of T.W.1, D.W.1, and D.W.2 to M.H. and legal custody of T.F.2 to E.D. is affirmed.

. . . . . . . . . . . . .


DONOVAN, J. and EPLEY, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Lisa M. Light
P.J. Conboy, II
M.H.
E.K.D.
Randall Lee Stump
T.F.F.
John C. Meehling
Richard D. Donenfeld, GAL
Hon. Anthony Capizzi